Roosevelt BUTLER, Appellant,

v.

UNITED STATES, Appellee.

No. 95–CF–492.

District of Columbia Court of Appeals.

Argued Sept. 25, 1996.
Decided Dec. 30, 1996.

Cynthia Jones, Public Defender Service, Washington, DC, with whom James W. Klein, Samia Fam, and David Reiser, Public Defender Service, were on the brief, for appellant.

Eumi Choi, Assistant United States Attorney, Washington, DC, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Thomas C. Black, and Douglas Klein, Assistant United States Attorneys, were on the brief, for appellee.

Before FERREN and REID, Associate Judges, and NEWMAN, Senior Judge.

Opinion for the court by Associate Judge REID.

Concurring opinion by Associate Justice FERREN at 389.

Concurring opinion by Senior Judge NEWMAN at 398.

REID, Associate Judge:

Appellant Roosevelt Butler was charged with assaulting a police officer while armed, in violation of D.C.Code § 22–505(b) (1996 Repl.), and assault with a dangerous weapon, in violation of D.C.Code § 22–502 (1996 Repl.). Before trial, Butler contemplated one of two possible defenses, (a) bias, harassment and fabrication on the part of the arresting police officers; or (b) misidentification. Defense counsel orally sought an *in limine* ruling on the permissible extent

of the government's response to its bias, harassment and fabrication defense. When the trial court preliminarily ruled, *inter alia*, that if the defense relied on that theory, the government could introduce evidence of the officers' prior contacts with Butler, including the "reasons, times and dates" of the contacts, Butler decided to use the misidentification theory. With regard to misidentification, the trial court permitted the police officers to testify as to their prior contacts with Butler, but precluded any reference to their prior arrests of him. Butler was convicted on both charges and sentenced under the Youth Rehabilitation Act, D.C.Code § 24–803(b) (1996 Repl.).[1]

Butler appeals on two grounds: (1) the trial court's ruling that his reliance on a police bias, harassment and fabrication theory would open the door to detailed impeachment testimony by the two arresting police officers regarding their prior contacts with him, constituted reversible error, because the ruling severely prejudiced his case; and (2) the trial court abused its discretion in permitting the two arresting police officers to testify at trial concerning their "official contacts" with Butler. We affirm because we conclude that (1) on the specific record before us, Butler failed to preserve the impeachment issue for appellate review, and hence, there is no record on which this court could reach a decision without conjecture; and (2) the trial court did not abuse its discretion in permitting the police officers to testify about their official contacts with Butler in response to his misidentification theory, and there was no unfair prejudice to Butler.

## FACTUAL SUMMARY

On September 11, 1994, at approximately 3:53 a.m., police officer Dennis Spalding and his partner Michael Baker, both four and one-half year veterans of the Metropolitan Police Department, were on duty in a police cruiser in the 2500 block of Elvans Road, S.E. When the officers approached a four-way stop sign at Elvans and Stanton Roads,

they stopped and watched as a green Ford Explorer waited at its stop sign. Officer Spalding recognized the driver of the Explorer as appellant Roosevelt Butler, "someone [whom he] knew from the area." The officer recalled that Butler's driving permit had been suspended.

When the Explorer made a right turn onto Elvans Road and picked up speed, Officers Spalding and Baker followed. Soon the Explorer turned into a dead end parking lot used by the residents of apartments located at 2500 Elvans Road. The officers continued to follow the Explorer, turned into the parking lot and saw a man approach the driver's side of the Explorer. At this point, Officer Spalding illuminated the police cruiser's emergency, rotating and take down lights. He then exited the police cruiser with Officer Baker and locked the door. As Officer Spalding walked toward the Explorer, it took off and began to make a U-turn. Officer Spalding retreated toward the police cruiser. He fumbled around trying to find the right key on the chain because he was not driving his regular cruiser. Periodically, he looked at the Explorer. When it moved towards him, Officer Spalding "walked fast or ran" to the rear of the police cruiser. The car hit the officer and "knocked [him] behind the trunk of the . . . cruiser" where he "hit the ground." He estimated that the Explorer pushed him about six or seven feet. He was not injured. As he was hit, he looked the driver "right in the face" and recognized him as Butler.

Officer Spalding returned to his cruiser with Officer Baker, and the two officers tried to pursue the Explorer. They also radioed a description of the Explorer, identified the driver as Butler, and stated that Butler was nineteen years old. Based upon his familiarity with Butler, Officer Spalding told the dispatcher the area in which Butler lived and might be found. Officer Spalding received a return report that Butler did not have a driver's permit, and the license tags on the Explorer were not listed. The dispatcher reported that Butler lived on Ridge Crest

---

1. Butler was sentenced to concurrent terms of ten years incarceration on each count, all but six months of which were suspended. He was placed on probation for two years and ordered to serve one hundred hours of community service.

Court, S.E. However, the police officers first looked for Butler in the area they thought he frequented. When the officers did not see Butler, they drove to the Ridge Crest Court address. There they saw a car and recognized the driver as the person who had approached the Explorer in the Elvans Road parking lot. Squinched down in the front passenger seat of the car was Butler. He was arrested for assaulting Officer Spalding with the Explorer. At trial, Officer Baker confirmed Officer Spalding's account of the events.

Various defense witnesses, including Butler, testified as to Butler's whereabouts on the night and the early morning hours in which Officer Spalding was hit with the Explorer. The mother of Butler's infant child said he was with her in his parents' home until he went out around 3:45 a.m. to buy some Pampers for the baby.[2] One of Butler's sisters initially stated that he did not leave the house while she was there on the night of September 11, 1994. On cross-examination, however, she acknowledged that Butler left the house and admitted uncertainty as to whether it was around 2:30 a.m. or some other time. She insisted that only approximately two minutes elapsed between the time Butler left the house with his cousin and the arrival of the police.

Butler's cousin testified that Butler called him to request a ride to the store to purchase milk and Pampers for the baby. Prior to picking Butler up, the cousin said he went to a party in the 2500 block of Elvans Road. There he saw a green truck get close to a police officer. The police officer pushed off from the truck but did not fall to the ground. The cousin stated that the driver of the green truck was not Butler. In his own testimony, Butler denied being in the Explorer that hit Officer Spalding.

## Pretrial Discussion of the Bias, Harassment and Fabrication Issue

During a pretrial conference on January 25, 1995, and continuing to January 26, counsel for the government raised an issue regarding what he anticipated as the defense theory, and the probable government response to that theory. In essence, he expected a harassment and fabrication defense, and indicated that the government would respond by denying the allegations and by presenting evidence of police contact with Butler. Defense counsel said part of Butler's defense would be harassment "in a number of unofficial ways," and stated that defense would not "[open] the door to every single arrest or every single official contact" police officers had with Butler. Butler's counsel added that another defense theory would center on "a grudge" that the arresting officers had against Butler who had been a defense witness in a 1992 drug case in which Officer Spalding and Officer Baker testified as government witnesses. The defendant was acquitted and, subsequently, according to defense counsel, the officers threatened to get Butler and harassed his family.[3] The government should not be permitted to get into the prior arrests of Butler, defense counsel asserted, because disclosure of the prior arrests would be "extremely prejudicial."

The government argued that it should be allowed to rebut the defense case by presenting evidence of prior arrests and contacts by Officers Spalding and Baker because the defense evidence would be "prejudicial to the Government's case." Specifically, the government identified at least six contacts it was prepared to introduce through the testimony of the police officers: (1) two stops of Butler on August 24, 1992, one for driving a Ford pick-up truck without a license, and the other relating to a drug sale;[4] (2) an arrest on

2. She was impeached with her past record.

3. Defense counsel stated:
   Officer Spalding and Officer Baker basically have harassed my client ever since then; have made their displeasure with him for testifying known; have expressed their dislike of him, and have harassed him and—and stopped members of his family and—and engaged in a

multitude of harassing acts against my client. And that's one of the bases for their fabrication of this charge.

4. No charges were brought against Butler. However, on the same day, one of Butler's friends was arrested in connection with the drug sale. He was acquitted after a trial in which Butler testified as a defense witness.

August 28, 1992 for receiving stolen property; the case was later dismissed; (3) a juvenile adjudication after an arrest on September 4, 1992 for possession of twenty-four rocks of cocaine with intent to distribute; Butler entered a guilty plea as a juvenile; (4) observation of Butler on March 9, 1993 while he was with others—four weapons were found; no arrest was made; (5) another observation of Butler distributing drugs in February or March 1993; no arrest was made; and (6) a robbery-related arrest in September 1994; Butler was acquitted.

In a ruling on the bias, harassment and fabrication issue, which the trial court referred to as preliminary, the trial judge stated:

> I'm inclined to agree with [government counsel] that once raised, especially in light of the—proffer here where they're saying that didn't happen, that's a prevarication, and we did stop him, and they can list reasons, times and dates and—and—I'm inclined to say that that's—that would be proper for the Government to—to assert that.

Furthermore, in again stressing the preliminary nature of its ruling, the trial court stated that if the defense theory were bias and fabrication, the government would be allowed "to bring those ... contacts in full context" because "it's just fundamentally fair for the police to be able to respond to such serious allegations and to put the whole matter in its completeness before the jury." The trial court expressed the view that "full disclosure would be in the best interest with a limiting instruction." That is, evidence of Butler's arrests and the disposition in each case would be permitted with a proper instruction. As the trial court put it, the instruction would say, in essence, "these arrests and/or convictions and/or acquittals are only being admitted to show the relationship of the parties and to allow the jury to explore the nature of the relationship of the parties." No inference of propensity to commit the crime charged could be made. The trial judge emphasized that his ruling was preliminary when he said, "I understand that we're all sort of thinking these things through at the same time, but we can address that [nature of the allowable disclosure and the limiting instruction] tomorrow. But I think everyone should be prepared to move on that ruling [regarding full disclosure with a limiting instruction]." In addition, the trial judge said: "I think bias cross examination of any witness always opens the door, to some extent, to the full nature and context of that in order to allow any witness, in order to be fair to that witness, the defense or the Government[,] to explain what ... bias, if any, exists." Finally, the trial judge appeared to indicate that he had resolved most issues, but that at least two remained: "And in my mind right now the only open point is whether or not the ... final resolution of the adjudication in the juvenile and the acquittal in the adult case come in, I'm leaning to allowing them to come in. But I'll hear from the parties tomorrow on that point."

## Pretrial Discussion of the Misidentification Issue

Just before trial on January 26, 1995, defense counsel announced that Butler would proceed on misidentification theory, "I'm not going to open on ... and I do not anticipate crossing either officer on any bias." The discussion between counsel and the trial judge then shifted to the permissible limits of the government's response to a misidentification theory. Initially the trial court indicated that the officers could recount their past arrests of Butler. When the defense expressed disagreement, the trial court considered sanitizing the officers' testimony. After reviewing cases cited by Butler's counsel, the trial court made a "preliminary ruling ... that the government is not allowed to use the introduction of [Butler's] prior arrests in opening statements or in its direct examination." When the government insisted that if the defense "opened the door," it should be allowed "to establish why [Butler's] known so well," the trial judge decided "to defer ruling on this issue until I know what we're talking about...."

The trial judge also said, "I'm sensitive to the fact that prior arrests, can be very prejudicial...." Just before the jury was

brought in, the trial judge stated, "[the government could] go through the individual dates [of contact with Butler], ... and that they met him and they talked with him, they saw him, they know his name, they know where he lives, whatever to indicate that they know who this individual is."

## Trial Issues Regarding the Misidentification Issue

While Butler's trial was in progress, the issue of how much the police officers could say about their prior contacts with him came up several times. Near the end of Officer Spalding's direct examination, the government attorney asked, "And how well do you know Mr. Butler"? The Officer responded, "I've had numerous contacts with him over the last three or four years." There was no objection. Government counsel then asked, "How many contacts ... ?" He responded, "I'd say between six and eight." Officer Spalding went on to say, in response to two other questions, that he had no doubt that Butler was the person he had seen on the evening of September 11, 1994, and that he "looked [Butler] right in the face ... from the stoplight at the intersection until the parking lot, until the vehicle hit me." At this point the government attorney terminated his direct examination.

Defense counsel requested a bench conference to inquire about the schedule for the day. During this bench conference government counsel stated that, despite his instructions, Officer Spalding used the word "numerous [contacts]." However, government counsel argued that the matter had been corrected because Officer Spalding specified the number of contacts as six to seven. Defense counsel still raised no objection to the use of the term "numerous contacts." The next day of trial, however, defense counsel raised a continuing objection to the phrase "official contact in my line of duty." Defense counsel thought the jury would understand

this phrase to mean that Officer Spalding had arrested Butler six or seven times.

During cross-examination defense counsel was careful to avoid any discussion of prior contacts between Butler and Officer Spalding. On redirect examination, Officer Spalding asserted, *inter alia*, "I have had ... contact with Mr. Butler in an official police manner six or seven times...." The trial court overruled the defense objection. Officer Spalding went on to state, "I have had contact with Mr. Butler approximately, I would say, 10–13 times total, some of which were not in a police capacity." When government counsel sought the specific dates of "official contacts" with Butler, the trial judge interrupted to give the following limiting instruction:

You're explicitly instructed that ... the police have contacts with many individuals for many reasons. And the fact that the officer had contact with Mr. Butler in the past prior to this incident is not in any way, shape, or form to be construed by you because of law violations on the part of Mr. Butler. And you are explicitly instructed that you are not to assume that Mr. Butler had law violations in the past. This evidence is only being admitted to show that the officer had an opportunity to know who Mr. Butler was. And that's the government's theory that the officer knew who Mr. Butler was and was able to make an identification.

Officer Spalding then provided six dates of contact with Butler from August 23, 1992 to July 1993.[5] He stated that on each of these dates he had an opportunity to observe Butler and to speak with him. When asked what physical features distinguished Butler from others Officer Spalding knew in the area of his beat, Officer Spalding mentioned, *inter alia*, Butler's "long angular face," his "high cheek bones," and his "deep set eyes." He indicated that he has never mistaken someone else for Butler, and that he was able to see Butler clearly in the parking lot *because* of the take down and rotating lights on the

---

5. The specific dates were August 23, 1992, August 24, 1992, August 28, 1992, September 4, 1992, March 9, 1993 and July 1993.

police cruiser. When Officer Baker testified that he knew Butler "from official contacts," the trial judge overruled defense counsel's objection and reiterated its limiting instruction. Officer Baker identified Butler as the person who struck Officer Spalding on September 11, 1994.

At the conclusion of all testimony and prior to closing arguments, the trial court offered to give its "official contacts" limiting instruction again during final instructions to the jury. Defense counsel responded, "Actually, no, Your Honor, I don't wish that.... I have heard it twice." The trial court then cautioned both counsel regarding what could be said about the police officers' prior knowledge of Butler.

During its closing argument, the government made reference to "official contacts" or "numerous contacts" by the police officers with Butler, but went on to say that there is "no evidence ... that these officers have any reason to get Mr. Butler," and "[the officers] did not make this up. They are not going to throw their careers away to get Roosevelt Butler." Government counsel also implied that, unlike one defense witness who was related to Butler, the officers did not have a motive to fabricate, "because they were just doing their job." The trial court overruled the defense objection. During its rebuttal argument, government counsel sought to "go over the dates when Officer Spalding had seen [Butler] face to face, official contact." The trial court sustained defense counsel's objection and said: "I don't think it's proper rebuttal. The defense did not contest that in any fashion[,] that the police officer did not know this defendant. It seems to me at this point it would just be highlighting something." Government counsel asked, "I can't comment as to the extensive contacts"? The trial court responded by allowing the government to comment "as to the extensive contacts" with Butler. Government counsel closed his argument, however, by saying only that "Officer Spalding knows Roosevelt Butler. There was no mistake. Officer Baker knows Roosevelt Butler. There was no mistake that night."

## ANALYSIS

### The Bias, Harassment and Fabrication Issue

We turn first to Butler's contention concerning the trial court's alleged reversible error "in ruling that cross-examination of the arresting officers on bias 'opened the door' to evidence of appellant's prior arrests by the same officers." According to Butler, this ruling severely prejudiced his defense. He points out that a witness' bias is relevant to witness credibility, and asserts that prejudice to his case stemmed from the trial court's ruling that he could not discuss his role as a defense witness in a case in which Officers Spalding and Baker were government witnesses, and in which the defendant was acquitted, because the trial court ruled that the police officers in response could tell about their prior arrests of Butler. The introduction of prior arrest testimony would have been akin to prior bad acts introduced to show propensity to commit the crime charged, Butler argues. He further asserts that the government could have rebutted his bias evidence without reference to his prior arrests. According to Butler, this approach would have been consistent with the doctrine of "evidentiary parity" discussed in *Johns v. United States*, 434 A.2d 463 (D.C.1981). In Butler's view, the offer of a limiting instruction could not overcome the prejudice of the officers' testimony about their arrests of Butler, and the disposition of cases in which he was charged with criminal acts. In the end, says Butler, the government was able to exploit the absence of a bias, harassment and fabrication defense by commenting in its closing argument on the absence of any evidence showing the officers had "any reason to get Mr. Butler" or to fabricate the charges against him.

In response, the government first maintains that under *Luce v. United States*, 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984), Butler did not preserve this issue for appellate review. Because of our conclusion on this issue, we do not reach the merits of Butler's argument regarding the contemplated bias, harassment and impeachment defense. In *Luce*, the Supreme Court held that "to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." 469 U.S. at

43, 105 S.Ct. at 464.[6] The United States District Court for the Western District of Tennessee had ruled that use of the prior conviction to impeach was consistent with Rule 609(a) of the Federal Rules of Evidence,[7] but that "the nature and scope of petitioner's trial testimony could affect the court's specific evidentiary rulings." 469 U.S. at 40, 105 S.Ct. at 462. The Supreme Court questioned an appellate court's ability "to rule on subtle evidentiary questions outside a factual context." *Id.* at 41, 105 S.Ct. at 463. Furthermore, the court said, "[b]ecause an accused's decision whether to testify 'seldom turns on the resolution of one factor,' (citations omitted), a reviewing court cannot assume that the adverse ruling motivated a defendant's decision not to testify." *Id.* at 42, 105 S.Ct. at 463. With regard to the issue of harmless error, the *Luce* court pointed out that "[w]ere *in limine* rulings under Rule 609(a) reviewable on appeal, almost any error would result in the windfall of automatic reversal; the appellate court would not logically term 'harmless' an error that presumptively kept the defendant from testifying." *Id.* at 42, 105 S.Ct. at 463. In their concurring opinion in *Luce,* Justices Brennan and Marshall stressed the need for an appellate court to know "the specific factual context of a trial as it has unfolded" in order to conduct a "careful weighing of probative value and prejudicial effect" of the challenged testimony.[8]

Butler argues that *Luce* is inapplicable because "the disputed issue [in Butler's case] was fully litigated pretrial" and covers thirty-eight pages of the transcripts. Moreover, argues Butler, the trial court's *in limine* ruling was final.

While the *Luce* issue has been raised in prior cases, generally we have either not reached it, or not embraced or adopted its holding. *See Marshall v. United States,* 623 A.2d 551, 556 (D.C.1992) (*Luce* issue not reached because "the ruling allowing the question to be put to the character witness was proper"); *Allen v. United States,* 622 A.2d 1103, 1104 (D.C.1993) (*Luce* issue not reached because "the record [failed] to support appellant's argument that the added factor of likely impeachment with a rape . . . conviction materially influenced his decision not to testify"); *Askew v. United States,* 540 A.2d 760, 761 n. 1 (D.C.1988) (because of the disposition of appellant's arguments, "we need decide neither the question whether to adopt the principle of *Luce,* nor the question whether, if we adopt it, to apply *Luce* prospectively from the date it was decided or prospectively from the date of the adopting opinion"); *Devore v. United States,* 530 A.2d 1173, 1174 n. 3 (D.C.1987) (case could be "[decided] on the merits without reference to *Luce*"); and *Ross v. United States,* 520 A.2d 1064, 1065 n. 2 (D.C.1987) (appellant was tried before *Luce* and in *Langley v. United States,* 515 A.2d 729, 733 (D.C.1986) this court decided not to apply *Luce* retroactively).

■ *Luce* involved a defendant who did not testify after an *in limine* ruling that the government could impeach him with a prior conviction. In contrast, Butler decided not to rely on or testify regarding a bias, harassment and fabrication defense after a preliminary *in limine* ruling that the government could impeach him by focusing on "the reasons, times and dates" of Butler's prior arrests, convictions and acquittals. Nonetheless, the principles enunciated in *Luce* are applicable to the specific record before us.

Our review of the record on appeal reveals that the trial judge signaled throughout his

---

**6.** The petitioner in *Luce* asked for a pretrial ruling to prevent the government from impeaching him with a prior conviction. Defense counsel did not commit to testimony by the defendant, nor indicate the nature of his testimony if the defendant took the stand.

**7.** "Rule 609 governs the admissibility of evidence of a prior conviction." *United States v. Sanderson,* 966 F.2d 184, 189 (6th Cir.1992).

**8.** The same type of discretionary "weighing" is not present in situations calling for a legal con-

clusion. As Justice Brennan stated, "In . . . [cases] in which the determinative question turns on legal and not factual considerations, a requirement that the defendant actually testify at trial to preserve the admissibility issue for appeal might not necessarily be appropriate. The appellate court's need to frame the question in a concrete factual context would be less acute, and the calculus of interests correspondingly different. . . ."

pretrial discussion with the prosecution and defense counsel that he had not come to a final conclusion concerning his ruling. He used words such as "preliminarily," or "I am inclined" or "we're all sort of thinking these things through" or "we can address that tomorrow." Even when he uttered the words, "in my mind right now the only open point," the trial court went on to say that two issues had not been resolved: "the final resolution of [whether to allow testimony concerning] the adjudication in the juvenile and the acquittal in the adult case.... I'm leaning to allowing them to come in. But I'll hear from the parties tomorrow on that point."

*Luce*'s concern about an appellate court's ability "to rule on subtle evidentiary questions outside a factual context," 469 U.S. at 41, 105 S.Ct. at 463, is directly applicable here. Final trial court rulings on key issues of admissibility were not made. Moreover, the defense never proceeded on the bias, harassment and fabrication theory. Hence, there was no occasion for Butler to testify as to the alleged bias and harassment of Officers Spalding and Baker, nor any reason for Butler to cross-examine the officers regarding their supposed anger and retaliatory mentality flowing from Butler's testimony as a defense witness in a case in which the two officers testified as government witnesses, and in which the defendant was acquitted. Nor was there any occasion for the government to redirect questions to the officers concerning their prior arrests of Butler and the disposition of those cases. Significantly, we do not know whether the trial court would have permitted evidence as to Butler's juvenile adjudication or his acquittal as an adult. Had the trial judge permitted only testimony regarding contacts with Butler that did not result in arrests, the case would be in a different posture before us. Simply put, we have no factual or record context to resolve Butler's contention on appeal. As the Court said in *Luce*, "it would be a matter of conjecture whether the [trial court] would have allowed the [g]overnment to attack [appellant's] credibility at trial by means of the prior conviction."

We cannot "assume that any adverse *[in limine]* ruling motivated [Butler's] decision not to ... [rely on a bias, harassment and fabrication theory]." *Id.* at 42, 105 S.Ct. at 463. More than one defense theory was available, and Butler had to weigh the risks and advantages of each theory. In addition, as the court asserted in *Luce*, if discretionary *in limine* rulings are "reviewable on appeal, almost any error would result in the windfall of automatic reversal; the appellate court could not logically term 'harmless' an error that presumptively kept the defendant from testifying," or as in this case, from testifying about the bias, harassment and fabrication of key government witnesses. Without Butler's testimony, as opposed to a proffer which provided only a skeletal outline of Butler's proposed testimony on the bias, harassment and fabrication theory, we cannot "determine the impact any erroneous impeachment may have had in light of the record as a whole," and, if we require the defendant to testify and to make his or her record, "it will also tend to discourage making *[in limine]* motions solely to 'plant' reversible error in the event of conviction." *Id.* Accordingly, we hold that where (1) there is an *in limine* ruling that does not represent the trial court's complete and final decision regarding the use of prior arrests to impeach a defendant who contemplates relying on a bias, harassment and fabrication theory; (2) the defendant does not testify regarding his or her skeletal outline of that proffered but later abandoned defense theory; and (3) the trial court cannot reasonably rule on the *in limine* motion on the basis of the proffered testimony, the principles enunciated in *Luce* are applicable. Based on the record in this case, Butler may not challenge the trial court's discretionary *in limine* ruling because it did not constitute a final ruling on the impeachment issue; because Butler provided no testimony to the trial court regarding his bias, harassment and fabrication theory; and because, based on Butler's general proffer of his testimony, the trial court could not reasonably provide a ruling on the *in limine* request. Therefore, Butler did not preserve the impeachment issue for appellate review, and there is no record on which this

court could reach a decision without conjecture.

### The Misidentification Issue

■ Second, Butler contends that the trial court abused its discretion in allowing "the government to elicit that [Butler] had numerous contacts with Officer Spalding 'in an official police manner.'" In *Bean v. United States*, 576 A.2d 187, 188 n. 2 (D.C.1990), we found no merit to appellant's argument that his conviction should be reversed because of a police officer's testimony that "he was able to identify [the defendant] due to a previous 'official' encounter." Similarly we see no merit in Butler's argument that the phrases "numerous contacts" or "in an official police manner" translate into "police arrests." Indeed, Butler never moved for a mistrial based on the use of these phrases. Furthermore, the trial court gave a limiting instruction during the trial testimony of both Officer Spalding and Officer Baker which "explicitly instructed" the jury "not to assume that Mr. Butler had law violations in the past." The trial court further instructed the jury that "[t]his evidence is only being admitted to show that the officer had an opportunity to know who Mr. Butler was."

The trial judge offered to include its limiting instruction in the final instructions to the jury. Defense counsel refused the offer, however, and said: "Actually, no, Your Honor, I don't wish that.... I have heard it twice." In view of the limiting instruction and in the absence of a motion for a mistrial, we cannot say that the trial court abused its discretion, or that Butler suffered any unfair prejudice as a result of the trial court's rulings. *See Harris v. United States*, 366 A.2d 461 (D.C.1976); *Clark v. United States*, 639 A.2d 76 (D.C.1993). We have no reason to believe that "the jury's verdicts would have been different in the absence of the challenged remark[s]" because the identification of Butler by both Officer Spalding and Officer Baker was clear and unequivocal, and "overpoweringly [established Butler] as the

perpetrator" of the crime against Officer Spalding. *Harris, supra,* 366 A.2d at 464 (citation omitted).

For the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*

FERREN, Associate Judge, concurring:

I write separately to underscore the narrowness of the court's opinion.

### I.

### A.

In citing *Luce v. United States*, 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984), the court today does not formally adopt it. *Luce* held that, in order "to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." *Id.* at 43, 105 S.Ct. at 464. Here, in contrast, in order to rebut Butler's anticipated accusations of police bias, fabrication, and harassment, the government sought to introduce in evidence six of Butler's prior "bad acts," as reflected in three police "stops," one formal arrest for an unadjudicated charge, an acquittal after trial, and one juvenile adjudication—none of which qualifies as a "prior conviction" under D.C.Code § 14–305 (1995 Repl.).[1] The trial court effectively ruled that the government could do so, strictly in rebuttal.

Apparently as a result of this ruling, Butler abandoned his bias, fabrication, and harassment defense. Thus, the question is: whether Butler has preserved for review, through proffered evidence, his challenge to the government's proffered rebuttal, without having testified himself (or called other defense witnesses to testify or proceeded with cross-examination of the police officers on bias) in support of his abandoned defense.

---

1. Evidence of a juvenile adjudication cannot be introduced as a prior conviction to impeach the testimony of a defendant. *See* D.C.Code § 16–2318 (1989) (juvenile adjudication or disposition is not a "conviction of a crime"); *Brown v. United States*, 338 F.2d 543, 547–48, 119 U.S.App. D.C. 203, 207–08 (1964) (holding that a juvenile adjudication is not a "conviction" of a "criminal offense" for purposes of impeachment by prior conviction under D.C.Code § 14–305).

## B.

This case has much in common with *Marshall v. United States*, 623 A.2d 551 (D.C. 1992), where we sustained the trial court's *in limine*[2] ruling that the government could cross-examine the defendant's "character witness concerning a previous arrest of the appellant for possession of a controlled substance (PCP)." *Id.* at 555. There, the government, citing *Luce*, argued that the appellant should not be allowed to challenge the ruling because the claimant's witness had not, in fact, testified. In sustaining the ruling on the merits as a matter of law, we said that "we do not need to reach the issue raised in *Luce*." *Id.* at 556. Nor did we have to review the adequacy of appellant's proffer at trial. We noted, however, that the failure of the defense to proffer particular details concerning the time periods the witness and the community knew the appellant posed troubling uncertainties.

> Those [time] factors may, or may not, have affected the trial court's ruling had [the court] known of them. But, this failure to present them in a more precise proffer, or by the witness's actual testimony, prevented those uncertainties from being explored.

*Id.* at 556. We therefore indicated that, if we had been unable to sustain the court's *in limine* ruling as a matter of law, we might well have held that the appellant's challenge failed for lack of "a more precise proffer," *id.*—as we rule in this case.

*Marshall* accordingly made clear that affirmance in a case such as this can be premised on lack of an adequate proffer. Thus, we need not—and do not—rule here, as *Luce* would have it, that Butler is foreclosed from contesting the trial court's ruling on appeal simply because he abandoned his intended bias/fabrication/harassment defense at trial.

Judge Reid's opinion for the court makes clear that "a more precise proffer," *Marshall*, 623 A.2d at 556, could have saved appellant's right to appellate review of the trial court's *in limine* ruling. See *ante* at 387. The court's opinion states that "the

principles enunciated in *Luce* are applicable" in this jurisdiction only when three criteria are satisfied: (1) the trial court's *in limine* ruling is not final, (2) defendant does not testify as to the proffered but abandoned defense theory, *and* (3) "the trial court cannot reasonably rule on the *in limine* motion on the basis of the proffered testimony." *Id.* (emphasis added). If, therefore, the *in limine* ruling is final, the defendant (or other defense witness) does not testify, but the trial court reasonably can decide the motion on the basis of proffered defense testimony, the *Luce* rule ("a defendant must testify") does not apply; the appellate court can review the merits of the defense argument on the basis of the parties' respective proffers. Indeed, in light of the two concurring opinions in this case, I assume that Judge Reid would have had the court expressly adopt *Luce* if she had believed that an across-the-board rule against standing to appeal based on trial court proffer was necessary to the result in this case. As the following discussion makes clear, however, the case is decided on the limited basis of Butler's inadequately proffered defense.

## C.

The opinion for the court makes clear that, in this case, we are unable meaningfully to review the pretrial ruling on the admissibility of the government's proffered evidence of Butler's prior contacts with the police, because Butler himself failed to proffer sufficiently detailed evidence of the bias, fabrication, or harassment which the government's testimony was intended to rebut. Thus, Butler's failure to put on live testimony, instead of a proffer, to establish his defense would not preclude our addressing the merits of that defense if the proffer had been adequate.

In anticipation of Butler's bias/fabrication/harassment defense, the prosecutor told the court:

> [PROSECUTOR]: I believe the defense in this case ... will be that Officer Spald-

---

**2.** *Luce* defines *"in limine"* as referring "to any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before

the evidence is actually offered." 469 U.S. at 40 n. 2, 105 S.Ct. at 462 n. 2.

ing has it out for the defendant in this case and that he's been harassing him over a significant period of time, and that this whole thing was concocted by Officer Spalding to get back at the defendant. Of course, the Government's position is that, that's false. If we do get into those issues, Your Honor, the Government is prepared to present evidence to the Court of what the contacts have been with Mr. Butler in this case. And those have been criminal contacts, one that led to a juvenile arrest and conviction for possession with intent to distribute.

The prosecutor then began to describe other such "criminal contacts" between Officer Spalding and Butler.

> Before the prosecutor completed his list, defense counsel acknowledged that police bias, harassment, and fabrication would be a defense:

> [TRIAL COUNSEL]: [C]ertainly I think certain motive to fabricate bias against the defendant is legitimate grounds for cross examination. I think no one will—will dispute that.

> And so that will be—and—and this officer having stopped my client previously, driven by his house, harassed him in a number of unofficial ways, is also legitimate grounds for cross examination.

More specifically, in support of Butler's bias/fabrication/harassment defense, Butler's counsel elaborated that the arresting officers had a "grudge" against him. Counsel told the court:

> [TRIAL COUNSEL]: The basis for the grudge would be that back in 1992 these two officers, Officers Baker and Spalding were—my client was a witness for the defense in a case in which Officers Baker and Spalding were the arresting officers and the two main Government witnesses.

> \*  \*  \*  \*  \*  \*

> [TRIAL COUNSEL]: The defendant was acquitted in that case and the officers have been threatening, harassing my client and his family since that time.

> [THE COURT]: Threatening the defendant and harassing his family?

> [TRIAL COUNSEL]: Yes, Well, harassing—I would say threatening the defendant and harassing his family. I'm not going to allege threats against his family.

> [THE COURT]: How were they threatening him?

> \*  \*  \*  \*  \*  \*

> [TRIAL COUNSEL]: They have threatened to get him and to make him pay and made those kinds of threats against him. They also—they also expressed that they had very, very great anger with my client, to the defendants' lawyer in that case. But I don't anticipate calling him as a witness.

> \*  \*  \*  \*  \*  \*

> [THE COURT]: ... All right, [counsel], why don't you just indicate what it is that—that is—that is the thrust of your defense here.

> [TRIAL COUNSEL]: Well, one of the—one of our—one of the points in our theory of defense, because that is not by any means the entire defense theory, but relevant to this issue is that the main reason that this officer has a grudge against my client is that my client was a defense witness for a defendant in a trial in 1992 in which Officers Baker and Spalding were the two chief Government witnesses.

> That trial resulted in an acquittal of the defendant. And Officer Spalding and Officer Baker basically have harassed my client ever since then; have made their displeasure with him for testifying known; have expressed their dislike of him, and have harassed him and—and stopped members of his family and—and engaged in a multitude of harassing acts against my client. And that's one of the bases for their fabrication of this charge.

Trial counsel then argued that evidence of such harassment did not open the door to admission of prior arrests evidence—even "legitimate stops" evidence—in rebuttal, because "those official stops don't preclude harassment.... Arresting ... someone for a legitimate reason doesn't necessarily mean you haven't harassed the individual in the past."

The prosecutor then began to describe the evidence of Butler's "prior encounters" with the police that the prosecutor intended to use in rebuttal to show that many police contacts with Butler had been for legitimate law enforcement purposes and, as a result, tended to refute an impression of encounters characterized as harassment.[3]

Defense counsel then indicated she was *not* arguing that the particular incidents to which the prosecutor had referred were "harassing stops." The court asked what counsel meant by "harassing." Counsel replied:

> [TRIAL COUNSEL]: That, for example, pulling—the defendant over, berating him and then letting him drive off for no—for no—no lawful purpose; stopping cars in which my client was a passenger; driving back and forth past my client's house at night; stopping members of his family as they were coming in and out of their house. That—that, alleging that those events take place is not rebutted by—by the officers saying well he's a drug dealer and I know it and I['ve] seen it.

The prosecutor then said:

> [PROSECUTOR]: [T]he officers ... have claimed to me that their encounters with the defendant have always been in an official capacity [and] that the Government's position is that the defense are going to have witnesses to come up and lie.

> \*　　\*　　\*　　\*　　\*　　\*

Now, you know, if they're going to have these witnesses come up and say this we should be allowed to explain, no, that's not what happened, ladies and gentlemen. These are the contacts that we've had with the defendant. And I think they can't have their cake and eat it too. They can't just say, oh, this is prejudicial. Well, their evidence is prejudicial to the Government's case. And I think the whole issue is irrelevant to the facts of this case; that you had a legitimate traffic stop that led to an incident.

Soon thereafter, the trial judge ruled "preliminarily" that if the defense were to cross-examine the police officers by referring to alleged harassment, the government would be allowed "to bring forth the other contacts that they have had with the defendant, to bring those ... contacts in full context."

At this point in the proceeding the government had specified three of the six police/Butler encounters on which it intended to rely. See *supra* note 3 (Nos. 3, 5, and 6). The government's detailed proffer, therefore, had shifted the burden of evidentiary production to Butler—a burden he never met. Butler had specified no particulars about the alleged "multitude of harassing acts" other than these government-proffered encounters. Conspicuously missing from the entire colloquy among the prosecutor, defense counsel, and the court was any defense proffer of Butler family witnesses (other than Butler himself) who would testify about particular

---

**3.** Eventually the prosecutor specified six such encounters, as summarized in Butler's own brief:

(1) On August 24, 1992 Mr. Butler was stopped for driving without a license; the same day Mr. Butler was also allegedly observed handing money to a person named Jerome Waller. Mr. Waller was arrested for drug possession, Mr. Butler testified on Mr. Waller's behalf at trial, and Mr. Waller was acquitted. Mr. Butler was never arrested in connection with either of these events.

(2) On August 28, 1992, Officer Spalding arrested Mr. Butler for receiving stolen property when Mr. Butler was stopped for operating a motorcycle with stolen license tags. Mr. Butler was charged in juvenile court and the charge was later dismissed as part of a plea.

(3) On September 4, 1992, Officer Spalding arrested Mr. Butler and charged him with

possession with intent to distribute cocaine. Mr. Butler pled guilty and was adjudicated in juvenile court. The receiving stolen property charge was dismissed as part of the plea.

(4) On March 9, 1993, Officer Spalding allegedly observed Mr. Butler standing with several other persons, one of whom displayed a pistol. Although Mr. Butler was stopped, he was never arrested because there was no evidence that Mr. Butler ever had possession of a weapon.

(5) In February or March of 1993, Officer Spalding stopped Mr. Butler and allegedly recovered drugs from him, but made no arrest because the buyers were not caught.

(6) In September of 1994, Officer Spalding was one of the officers who participated in the arrest of Mr. Butler in connection with an armed robbery. Mr. Butler was acquitted at trial.

incidents of harassment. Nor was there any proffered testimony by Butler that would specify incidents that clearly were other than those involving legitimate stops or formal arrests on which the government expressly proffered it would rely in rebuttal. See *supra* note 3.

Accordingly, the defense proffer—allegedly premised on incidents other than those cited by the government—was never given in enough detail (1) to demonstrate that the defense's police/Butler contacts did in fact differ from those relied on by the government, and thus (2) to permit the trial court, and this court on review, to evaluate Butler's contention that the government's incidents were (a) irrelevant, inflammatory rebuttal evidence that, on balance, (b) would be more prejudicial than probative. In sum, the defense proffer for cross-examination of the police never matched the detail of the government's proffered rebuttal by the police. See *supra* note 3. As a result, no court could evaluate whether the incidents contemplated by each side were the same or different—an evaluation critical to deciding whether the prosecution or the defense was correct in arguing, respectively, that particular Butler/police contacts should, or should not, be admitted in evidence. If Butler had proffered the "multitude of harassing acts" in the same detail that the government proffered its proposed rebuttal evidence, see *supra* note 3, we would be in a position to review—and, according to Judge Reid's opinion, would have reviewed—the merits of Butler's argument that the government's rebuttal evidence would have to be excluded at trial.

As foreshadowed in *Marshall,* this court correctly heeds *Luce*'s advice that we cannot " 'rule on subtle evidentiary questions outside a factual context.' " *Ante* at 388 (quoting *Luce,* 469 U.S. at 41, 105 S.Ct. at 463). Here, the probative value/prejudicial impact of the government's proffered rebuttal evidence is impossible to determine without the significantly more detailed context that would have emerged had Butler proffered particular evidence of police impropriety.

## II.

To put the *Luce* discussion in perspective we should note, first, that the Supreme Court's decision—however broadly it should be interpreted—is limited to evidentiary rulings in the federal courts. For a variety of reasons, quite a few state courts have expressly declined to follow it.[4] This nonconstitutional, evidentiary decision is not the kind of Supreme Court ruling to which state courts (including this court) owe any particular deference. See *Robinson v. United States,* 623 A.2d 1234, 1241 n. 9 (D.C.1993) (rejecting Supreme Court interpretation of federal rule of evidence as inconsistent with D.C. law); *State v. Whitehead,* 104 N.J. 353, 517 A.2d 373, 375 (1986) (rejecting *Luce* as nonbinding, nonconstitutional interpretation of federal evidentiary law).

Second, the literal holding of *Luce,* that a non-testifying defendant failed to preserve the right to challenge on appeal the trial court's ruling *in limine* authorizing impeachment by prior conviction under Fed.R.Evid. 609(a)(1), is of limited, if any, relevance in this jurisdiction. In the Superior Court, prior convictions "shall be admitted" for impeachment, D.C.Code § 14–305(b)(1), under specified circumstances, without discretionary weighing of "probative value" against "prejudicial effect," as the federal rule requires. Thus, any controversy over the use of prior convictions will pose a legal question for appellate review not dependant on a trial record; *Luce,* as to prior convictions, is inapplicable here.[5]

**4.** See, e.g., *Apodaca v. People,* 712 P.2d 467 (Colo. 1985); *State v. Ford,* 381 N.W.2d 30 (Minn.Ct. App.1986); *Settles v. State,* 584 So.2d 1260 (Miss. 1991); *State v. Whitehead,* 104 N.J. 353, 517 A.2d 373 (1986); *People v. Moore,* 156 A.D.2d 394, 548 N.Y.S.2d 344 (1989); *State v. McClure,* 298 Or. 336, 692 P.2d 579 (1984); *Commonwealth v. Richardson,* 347 Pa.Super. 564, 500 A.2d 1200 (1985), *appeal denied,* 525 Pa. 644, 581 A.2d 571 (1990).

**5.** From time to time there may be questions, for example, whether a particular prior conviction is admissible under § 14–305(b)(1) as involving, for example, "dishonesty or false statement." That inquiry would be purely one of law not subject to the *Luce* rule. See *post* at 398 (Newman, J., concurring) (*Luce* rule inapplicable where "evidentiary issue ... turns on 'legal and not factual considerations' ") (quoting *Luce,* 469 U.S. at 44, 105 S.Ct. at 464 (Brennan, J., concurring)); *Set-*

The question, then, is whether the *Luce* rationale should extend to limiting the defendant's right to appeal other types of *in limine* rulings when the defendant elects not to testify, or not to put on particular witnesses, as a result of the ruling.

Trial court rulings *in limine*, whether sought by the defendant or, as in this case, by the government, are useful because in deciding, early on, whether particular evidence is admissible—*e.g.*, prior convictions, other "bad acts," various statements—such rulings clarify how the parties plan to proceed, minimize guesswork and surprise, and thus generally help provide an orderly, fair trial for everyone concerned. Indeed, "[i]t is only after a ruling on the admissibility of a conviction" or other bad act, for example, "that the prosecutor and defense counsel can make an informed decision how to effectively try the case." *State v. McClure*, 298 Or. 336, 692 P.2d 579, 583 (1984).

This court has recognized and encouraged the *in limine* procedure. For example, although we have not adopted the portion of Fed.R.Evid. 404(b) entitling a defendant to advance notice if the prosecutor intends to impeach with other crimes evidence, we have said that the trial court has discretion to require such notice—thereby inviting a challenge *in limine*—and that the government risks reversal for abuse of discretion in event of unfair surprise. *See Johnson v. United States*, 683 A.2d 1087, 1100 n. 17 (D.C.1996) (en banc); *Ford v. United States*, 647 A.2d 1181, 1185–86 (D.C.1994); *cf. Hunter v. United States*, 606 A.2d 139 (D.C.) (encouraging use of *in limine* motion by defendants to determine proper scope of argument by government during closing arguments), *cert. denied*, 506 U.S. 991, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992). There may be occasions when a trial judge wishes to withhold a ruling on a motion to exclude evidence until relevant trial testimony is complete, in order to weigh probative value against prejudicial effect, but "this should be a rare occurrence." *McClure*, 692 P.2d at 583. "[I]n most cases the trial judge should be able to make this determination from an offer of proof in a pretrial motion." *Id.* A mini-trial is unlikely;

the prosecutor and defense counsel—as officers of the court—can provide the judge with sufficient details about the evidence they expect to present, and the judge can rule accordingly. *See id.; see also Settles v. State*, 584 So.2d 1260, 1263–65 (Miss.1991); *Whitehead*, 517 A.2d at 376–77.

Ultimately, the reason for motions and rulings *in limine*, beyond the practicalities required for an orderly, fair trial, may be to prevent an impermissible burden on the defendant's constitutional right to testify in his or her own defense. *See Apodaca v. People*, 712 P.2d 467, 472–73 (Colo.1985); *People v. Moore*, 156 A.D.2d 394, 548 N.Y.S.2d 344, 346 (1989). A defendant, after all, has a right to know, within limits, what is coming, in order to structure the defense, including a decision whether or not to testify. *See Apodaca*, 712 P.2d at 472–73; *McClure*, 692 P.2d at 583; *see also Settles*, 584 So.2d at 1262–64; *Whitehead*, 517 A.2d at 376; *cf. United States v. Pryce*, 938 F.2d 1343, 291 U.S.App. D.C. 84 (1991) (refusing to extend *Luce* to situation where trial court indicated a certain line of cross-examination by defense counsel would not be permitted; government argued that defendant should be required to ask the questions on the record, in front of the jury, to preserve the issue on appeal), *cert. denied*, 503 U.S. 941, 112 S.Ct. 1488, 117 L.Ed.2d 629 (1992). Although a chill on the right to testify is not asserted in this case, Butler's unquestioned intention to defend on grounds of police bias/harassment/fabrication, through cross-examination and, possibly, through third-party witnesses, at least indirectly implicates the right to testify, because the court's *in limine* ruling on these proffered defense tactics, if adverse, would certainly bear on Butler's only remaining alternative for presenting a defense: testifying himself. Thus, evidentiary rulings *in limine* are very powerful shapers of a trial, significantly affecting the fundamental right to present a defense.

Under the *Luce* theory, Butler would be required to present his proffered defense—cross-examination, witnesses, and perhaps his own testimony—as a condition of preserving his right to appeal the claimed trial court

*tles,* 584 So.2d at 1263; *Whitehead,* 517 A.2d at 376; *McClure,* 692 P.2d at 583.

error that permitted "bad act" evidence against him. But *Luce*, as a practical matter, implies much more. If adopted as the law, it would mean that Butler could preserve his appeal right only by putting his worst foot forward at trial—a roundly impeached defense—because of the claimed erroneous ruling. Alternatively, of course, he could put a better foot forward under the circumstances—a diluted defense without the feared impeachment (as Butler did here)—but only by foregoing his right to appeal the claimed error affecting the defense he had preferred to offer. Absent a right of interlocutory appeal, those are the only two choices under *Luce*.

The *Luce* alternatives are harsh indeed. If the defendant elects to testify and guesses wrong about the propriety of the allowed impeachment, the defendant will have preserved the right of appeal but, as it turned out, will have put on a worst-choice defense. If, on the other hand, the defendant elects not to testify, the defendant will have put on a second-choice defense and lost the right of appeal. The defendant, accordingly, will never have had an opportunity to test on appeal the first-choice defense—unimpeached or unrebutted testimony—without having crippled that defense at trial, through impeachment or rebuttal, as the price of admission to the appellate court. That price is too high.

> The purpose in allowing a motion *in limine* is to permit a witness to testify without threat of use of inadmissible evidence. If the threatened use of inadmissible evidence can prevent the defendant from testifying altogether and also deny her the opportunity to appeal an erroneous ruling on the admissibility of the evidence, the State would have multiple illegitimate opportunities to silence defendants, and the very purpose of the motion *in limine* would be lost.

*State v. Lamb*, 84 N.C.App. 569, 353 S.E.2d 857, 865 (1987), *aff'd*, 321 N.C. 633, 365 S.E.2d 600 (1988); *but see State v. Hunt*, 475 S.E.2d 722, 725–26 (N.C.App.1996), (following *Luce* and classifying above-quoted language as dicta).

*Luce* suggests two fundamental reasons for conditioning the right of appeal as it does (and thus offering the defendant two unsatisfactory choices). First, an *in limine* ruling is inherently tentative and not necessarily premised on reality; as the "case unfolds," the trial judge may change the *in limine* ruling to the defendant's benefit, *Luce*, 469 U.S. at 41, 105 S.Ct. at 463, or the government may elect not to use the prior conviction to impeach if the government has other means for doing so, *id.* at 42, 105 S.Ct. at 463–464, or the defendant may choose not to testify for reasons other than impeachment with a prior conviction, *id.* Thus, according to *Luce*, the record underlying the ruling may very well become obsolete. Second, because the ruling at best is based on proffers, not on actual testimony, the record available for appeal—even if the court, prosecutor, and defense counsel do not change position—will be too imprecise and incomplete to permit appellate review of the ruling, including review for harmless error. *See id.* at 41–42, 105 S.Ct. at 463–464. These reasons are unpersuasive.

As to the first, I believe the possibilities for a changed trial court ruling, or for a party's change of mind, are far more speculative—far less likely to occur—than the usual scenario when a trial judge rules adversely to the defense *in limine*. Typically, the judge will stick to the ruling, the prosecutor will stand ready to use the prior acts for impeachment if allowed to do so, and the defendant, as a result, will decide not to testify (or not to put on the impeachable witnesses). *See Whitehead*, 517 A.2d at 377; *see also Settles*, 584 So.2d at 1263. Furthermore, even if the Supreme Court is correct in surmising that some defendants will file pretrial motions *in limine* in order to "plant" reversible error when they have no intention of taking the stand at trial, *Luce*, 469 U.S. at 42, 105 S.Ct. at 463–464, I believe this possibility is minimal, although an assumption either way is speculative. In any event, I see no reason to base a rule of law, as *Luce* does, on an unproved assumption that such "error-planting" would be common enough to override the more logical assumption that defense counsel file motions to establish results on which they intend to rely. But even if there

is a likelihood that some defendants would try to "plant" reversible error without intending to rely on it, we should not address that risk by creating a disincentive for taking the stand. Finally, the potential for "error planting" abuse is a risk worth taking because the alternative—a policy that chills a defendant's right to testify and fosters waiver of the appeal right—is contrary, in my judgment, to the fair administration of criminal justice.

This case provides a good example of why the first *Luce* concern will often, if not usually, be illusory. On this record, I am easily satisfied that Butler was committed to his bias/harassment/fabrication defense not merely because he said so but also because the prosecutor anticipated it by filing the motion *in limine*. The prosecutor's motion makes clear, moreover, that the government would not have declined to introduce its "bad acts" evidence if Butler had put on the anticipated defense. Finally, had the defense proffer been detailed enough, I see no reason why the trial court's ruling would not have become final, rather than preliminary, at trial based on a proffered record adequate for our review. In short, I am confident that the record of the ruling *in limine* is settled enough—the court's and the parties' positions are firm enough—to assure that we would not be reviewing a hypothetical case, and, in particular, to assure that the ruling affected the defense strategy.[6] The *Luce* rule that would take away such appellate scrutiny on a case-by-case basis is altogether too rigid.

The Supreme Court's other basic concern in *Luce*—a trial court record, based on proffers, that is too imprecise and incomplete for review—is also much overstated. The Court worried that an appellate tribunal cannot adequately review the weighing of probative value against prejudicial effect without knowing "the precise nature of the defendant's testimony"—information that "is unknowable when, as here, the defendant does not testify." *Luce,* 469 U.S. at 41, 105 S.Ct. at 463. The Court added that harmless error review would be virtually impossible because the appellate court would be deprived of any way of evaluating how the erroneous impeachment would have impacted the defendant's testimony and affected the outcome, *see id.* at 42, 105 S.Ct. at 463–464; thus, any error that "presumptively kept the defendant from testifying" would likely "result in the windfall of automatic reversal." *Id.*

This analysis overlooks two considerations. First, if *in limine* rulings are desirable, indeed necessary on occasion, to achieve an orderly, fair trial for all concerned (recall that the government made the motion here), then they should be encouraged. Because an interlocutory appeal of such a ruling is not allowed, however, an incorrect ruling will continue to shape the trial. It is therefore not correct to say the defendant would receive a "windfall" if an appellate court were to hold, on review after trial, that the judge had erred and the defendant was entitled to a new trial free of the proscribed impeachment. The very nature and utility of the *in limine* procedure, which calls for a trial court decision based on proffers, would justify the reversal and remand precisely because the ruling presumably will have chilled the defendant's exercise of the fundamental right to present a defense. The very nature of the review focuses on an issue in a record much more circumscribed than the entire trial universe. The very price of encouraging *in limine* rulings without right of interlocutory appeal, therefore, is a narrower review than the usual error/harmless error analysis based on a complete trial record. If one is con-

---

**6.** It is true, of course, that a defendant will always be free to decline to take the stand or to refuse to pursue a particular line of questioning, regardless of any proffers or commitments offered by defense counsel. *See McClure,* 692 P.2d at 583 n. 2 (noting that "despite good faith representations by counsel, a defendant will always be entitled to change his or her mind about taking the stand"). New Jersey has taken this observation to its logical extreme and held that a defendant need not promise to testify or proffer an outline of her testimony in order to preserve the reviewability of the *in limine* ruling on appeal. *See Whitehead,* 517 A.2d at 377. While this may be an appropriate rule in the context of impeachment of a defendant by prior convictions, in a case such as this one a defendant necessarily must make a sufficiently detailed proffer on the record for the trial court (and the appellate court) to determine the admissibility of the evidence. *See ante* at 388–389.

cerned that an award of a new trial based on a ruling derived from proffers would be a "windfall," then an interlocutory appeal on an expedited basis is the answer, not compelled testimony, infected by unlawful impeachment, as the price of a later appeal.

The foregoing analysis proceeds from a premise that the record based on proffers is complete enough for appellate review. There is no reason why in many if not most cases the defense cannot supply a proffer, or on occasion even testimony out of the presence of the jury,[7] that could provide not only the trial court but also the reviewing court with a record detailed enough to ascertain whether the ruling *in limine* was erroneous. *See Settles,* 584 So.2d at 1263–64; *Whitehead,* 517 A.2d at 376; *McClure,* 692 P.2d at 582–83. This is the second reason why *Luce*'s concern about an unreviewable trial record is unconvincing.

In the present case, the trial court ruled *in limine* that the government could use Butler's prior "bad acts" to rebut the defense case presented through cross-examination of police officers and, possibly, through defense witnesses (or even through Butler's own testimony). As Judge Reid points out, a sufficiently detailed proffer of the bias/harassment/fabrication defense could have provided not only the trial court but also this court with an adequate basis for evaluating the defense motion in light of the government's proffered "bad acts" evidence. Had that been done, the result here might have been different. There would have been no need for Butler to put on his complete defense at trial, undermined by allegedly erroneous impeachment/rebuttal, if he had proffered the details of the defense to facilitate both a definitive trial court ruling and this court's appellate review.

The Supreme Court said in *Luce* that "[r]equiring a defendant to make a proffer of testimony is no answer; his [or her] trial

testimony could, for any number of reasons, differ from the proffer." *Id.* at 41 n. 5, 105 S.Ct. at 463 n. 5. True. But this overlooks the fact that the very purpose of proceeding *in limine* to resolve evidentiary questions in a criminal trial is the need to give both sides an opportunity to know, early on, what is coming and, as a consequence, the opportunity to make rational trial choices. Not every eventuality is predictable, of course; trials take unforeseen turns. But counsel, acting in the best interests of their clients—and as officers of the court—are, presumptively, not involved in prevarication when they seek evidentiary rulings. Presumably they are seeking answers on which to rely, for the reasons they give. *See Whitehead,* 517 A.2d at 377; *Moore,* 548 N.Y.S.2d at 346; *McClure,* 692 P.2d at 583, 584 n. 4. Indeed, if the defense were to prevail on a motion *in limine* based on proffered testimony that did not materialize as represented, the court obviously could change the ruling to permit withheld impeachment or rebuttal. Surprises, of course, will occur, but the likelihood of inaccurate proffers is substantially lessened by checks inherent in the system. In sum, the scope of an *in limine* ruling, based on detailed proffers, reflects an evidentiary universe with an imperfect but sufficient record for making the kind of decision needed at the time and later on appeal.

Whether the defense makes the motion or responds to it, the defense, of course, will have a burden of persuasion or production that requires a proffer detailed enough to satisfy both trial and appellate courts that the ruling should favor the defense. If the trial proffer—as in this case—is not sufficient to permit the reviewers to know whether the defense challenge was correct or not, then the review on the merits cannot go forward. But this is not to say—as *Luce* assumes—that a proffer never can suffice. It can. It can be detailed enough. But, even

---

7. In rare circumstances where a defendant's proffer is deemed inadequate to provide a basis for the trial court's ruling, the court could use a procedure similar to that used in suppression hearings. *See In re F.G.,* 576 A.2d 724, 727–28 (D.C.1990) (en banc). Specifically, the defendant could testify at a pretrial hearing, out of the presence of the jury, to establish any necessary

foundation for the court's ruling, without waiving her right not to testify at trial. *See id.* at 727. If the defendant then chose not to testify at trial, the hearing testimony would be inadmissible; if the defendant proceeded to testify at trial, she could be impeached with the hearing testimony as appropriate. *See id.* at 727–28 & n. 4.

more importantly in answer to *Luce*—and this bears repeating—the record with the ruling *in limine* is the correct and adequate basis for review precisely because the criminal justice system says, in effect, that *in limine* procedure is a worthwhile, virtually inherent component of a trial, and thus that its integrity must be recognized by appellate review that acknowledges the trial record limitations. If traditional harmless error review is prevented by the absence of the very unimpeached testimony that trial court error kept from the trial, then so be it; let reversal for erroneously thwarting the first-choice defense be automatic—not because a defendant deserves a "windfall" but because this is the anticipated price of a justice system that properly says, all things considered: an interlocutory appeal is unavailable; therefore, we will not force a defendant to give impeached or rebutted testimony as the price of challenging the *in limine* ruling on appeal after trial.

*Luce* may make good sense theoretically, but in practice it unnecessarily forces defendants to make an unfair election between (1) putting on a last-choice defense—*e.g.*, testifying and getting roundly impeached—in order to save the right to appeal the *in limine* ruling, and (2) putting on the best possible, though diluted, defense in light of that ruling while losing the right of appeal in event of conviction. There is a workable middle ground—use of the detailed proffer—that can resolve the *Luce* dilemma without the *Luce* rule.

I am satisfied that today we premise our opinion on that workable approach and correctly rule that Butler had standing to challenge on appeal the *in limine* ruling, but that his defense proffer at trial was inadequate for our review.

NEWMAN, Senior Judge, concurring:

I would make explicit what Judge Reid's opinion clearly implies. We adopt *Luce v. United States*, 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984) with the limitation provided in the concurrence of Justice Brennan, joined by Justice Marshall.

Explicitly stated, where a pretrial evidentiary ruling is one which is committed to the discretion of the trial court (such as the one in this case, *i.e.*, the scope of cross-examination and resultant re-direct and rebuttal), *Luce* would apply. To preserve such pretrial ruling for appellate review, the proponent is required to present such evidence during trial and obtain an in-trial ruling. On the other hand, where the evidentiary issue presented pretrial is a question of law and, in the words of Justice Brennan, turns on "legal and not factual considerations" a pretrial ruling is sufficient to preserve the issue for appellate review. One such issue was posed by Justice Brennan—"... the constitutionality of admitting immunized testimony for impeachment purposes, ..." Other such examples where a pretrial ruling would appear to be sufficient are the erroneous denial of a psychotherapist/patient privilege, *see Jaffee v. Redmond*, —— U.S. ——, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996), or an attorney/client privilege. In such cases, there is little need for factual context in order to inform appellate review.

It is based on this reading of Judge Reid's opinion that I join it.

### POSTSCRIPT

I write this postscript to respond in part to Judge Ferren's concurrence. I disagree that the proffer made by the defense was inadequate. One must keep in mind that what the defense sought to do was in the cross-examination of several government witnesses. Stated another way, the proffer related to the scope of cross-examination. In this context, the proffer was the best one could reasonably expect and, in my judgment, was clearly good enough. Thus, it is upon my understanding that we have adopted *Luce*, and only on that understanding, that I join in affirming the conviction.

Judge Ferren finds comfort for his view in *Marshall v. United States*, 623 A.2d 551 (D.C.1992) which he cites and relies upon at pp. 389–390 of his concurrence. *Marshall* is so factually dissimilar to our case as to simply be inapposite. Unlike *Marshall*, in the present case the time period of the alleged bias and harassment (the impeachment material) was well defined and there was no ques-

tion as to when Butler and the witnesses to be impeached (Officers Baker and Spalding) knew each other during that time period. Butler proffered that he testified as a defense witness in a trial in 1992 in which Baker and Spalding were the two chief government witnesses. The crime for which Butler was convicted occurred on September 11, 1994. Thus during this two-year time frame Butler alleged Baker and Spalding harassed Butler out of their anger at him for testifying for a criminal defendant who was acquitted. The alleged harassment started with this 1992 trial, and unlike *Marshall,* it was clear that the witnesses to be impeached were fully informed from that date as they testified at the trial, knew Butler testified at the trial, and knew the outcome of the trial.

Again, in my view, *Marshall* is simply inapposite.

In Section II of his concurrence, Judge Ferren set forth his views on why *Luce* should have been rejected. I will, with one exception, only respond to this section by describing what Judge Ferren said as Jeremy Bentham did in another context in the 19th century as a view "which one would suppose to have found its way from the gaming-table to the bench," 3 J. Bentham, *Rationale of Judicial Evidence* 579 (1827), reprinted in 7 *Works of Jeremy Bentham* 171 (J. Bowring ed. 1843).

The one exception reserved, above, related to Judge Ferren's view that we, as a court, should not create a disincentive for criminal defendants to take the stand as witnesses at trial. I do not read *Luce* as creating a disincentive for criminal defendants to testify for it is only if they present the proffered defense, which may or may not entail their taking the stand, that they may preserve the pretrial ruling for appellate review. Looking at it from that perspective one could in fact argue that *Luce* creates an incentive to testify (or at least to present the proffered defense), for only by doing so is the ruling preserved for appellate review. From the same perspective one could argue we have created an incentive for parties to make objections at trial, for only by objecting to a judge's ruling is the issue preserved for appeal under the "harmless error" standard of

review as compared to the more difficult "plain error" standard. But the purpose of encouraging parties to make objections or to present proffered theories is not to make incentives or disincentives, but to get all the facts on the table, all the players on the field. I have always thought our role as a court was to provide a constitutionally balanced and level playing field for that contest called a "trial" to take place. Nothing less; nothing more.