**Ari C. BAILEY, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 94–CF–1403.**

District of Columbia Court of Appeals.

Submitted March 27, 1997.

Decided Aug. 14, 1997.

G. Godwin Oyewole, Washington, DC, appointed by the court, filed a brief for appellant.

Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Thomas J. Tourish, Jr., Robert Spagnoletti and Robert Swanson, Assistant United States Attorneys, filed a brief for appellee.

Before STEADMAN and SCHWELB, Associate Judges, and PRYOR, Senior Judge.

SCHWELB, Associate Judge:

Ari C. Bailey was convicted by a jury of rape.[1] On appeal, he contends that the trial judge erred by ruling, *in limine*, that if Bailey testified and presented a defense of

consent, the prosecution would be permitted to introduce evidence of another rape allegedly committed by Bailey in Baltimore, Maryland approximately two months before the offense for which he was being tried. The government argues, *inter alia*, that because Bailey did not testify, he failed to preserve for appeal the issue raised by the judge's *in limine* ruling. We affirm.

## I.

### THE TRIAL COURT PROCEEDINGS

#### A. *The prosecution's case.*

The government alleged at trial that this was a case of "acquaintance rape." The complaining witness, N.G., testified that in December, 1993, she was twenty-one years old and a sophomore at Howard University. A recent transfer student from Morgan State University (MSU) in Baltimore, N.G. lived with two roommates at Howard Plaza Towers (the Towers), an apartment complex for Howard University students. At the time of the events in question, N.G.'s roommates were away for the Christmas vacation and she was staying in the apartment alone.

The defendant, Ari Bailey, also lived at the Towers, where he shared an apartment with his girlfriend of more than three years. Bailey was a graduate of MSU, and N.G. had been slightly acquainted with him there on a "hi" and "bye" basis. After N.G. had transferred to Howard, she and Bailey had also briefly encountered each other in the area of the Towers. N.G. testified, however, that at the time of the rape, she knew Bailey only by his first name, Ari. N.G. and Bailey were both originally from New York, and their families lived in New York City.

N.G. testified that on December 21, 1993, she received a telephone call from a female friend, who told her that Bailey had inquired where N.G. lived so that he could discuss with N.G. the possibility of travelling to New York together for the Christmas holidays. Later that evening, Bailey stopped by N.G's

---

1. Bailey's offense was committed on December 23, 1993. At that time, the crime of rape was proscribed by D.C.Code § 22–2801 (1981). That provision has been repealed by the Anti–Sexual Abuse Act of 1994, D.C. Law 10–257, § 501(a), 42 DCR 53 (1995) which became effective on May 23, 1995. *See* D.C.Code § 22–4102 (1996); *Russell v. United States*, 698 A.2d 1007 (D.C. 1997).

apartment. N.G. invited him in, and the two young people briefly discussed their days at MSU, as well as their potential joint travel plans.[2] The conversation ended when N.G. told Bailey that she was going to sleep; Bailey left without incident. The following evening, at about 11 p.m., Bailey telephoned N.G. and advised her that he could not travel to New York with her because he would be working.

On the next morning, December 23, 1993, at about 11 a.m., N.G. was in her bed, clad in a nightgown, and speaking to a female friend on the telephone, when she heard a knock on the door. She went to the door, looked through the peephole, and saw Bailey standing outside. N.G. testified that she asked him what he wanted, and that Bailey requested N.G. to let him use her telephone, claiming that he did not have one in his apartment. N.G. put on a robe, asked Bailey to come in, and returned to her bed to continue her telephone conversation. Bailey asked N.G. for something to drink and, at her instruction, drank from a cup in the kitchen and then joined N.G. in her room.

After N.G. completed her call, Bailey, who was sitting in a chair near N.G.'s bed, used her telephone and asked the party on the other end to page someone. A man soon called back on N.G.'s phone and conversed briefly with Bailey. N.G. testified that at this point she asked Bailey to leave because she had to pack for her trip to New York. Bailey asked if he could stay for another ten minutes, because the person whom he had paged was supposed to call back. N.G. agreed.

At some point during these events, Bailey had moved from the chair, and he was sitting on N.G.'s bed. Suddenly, according to N.G., Bailey "just ripped the covers off me." Startled, N.G. asked Bailey "what the F is your problem?" Bailey responded that "I just had an impulse." N.G. retorted: "Well, don't

have any more F-ing impulses," and she pulled the bedclothes back on top of her.

A few seconds later, Bailey pulled the covers off the bed again. This time, he climbed on top of N.G. in a straddling position and began to choke her. N.G. attempted without success to "push him off me." With his hands pressing on her throat, Bailey threatened N.G., ordering her to do what he said and asking rhetorically whether she wanted to see her family for the holidays. N.G. testified that by this time she was "scared out of my wits," and that she therefore "basically cooperated," telling Bailey that she would do whatever he wanted.

Bailey ripped off N.G.'s clothes. Since his intentions had now become obvious, N.G. asked him to use a condom. It turned out that Bailey already had a condom on his penis. He was, however, unable to penetrate her with the condom in place. Bailey finally pulled the condom off and had forcible unprotected sex with N.G.[3]

N.G. then asked Bailey to let her go to the bathroom. Once there, she pressed the push-button lock in an attempt to keep Bailey out and to protect herself from further harm. Bailey, however, used a plastic MSU identification card to gain entry into the bathroom.[4] N.G. complained that she was sore, and Bailey took some medication out of the cabinet and applied it to her scratches and bruises. According to N.G., Bailey then carried her back to the bed and had unprotected sex with her a second time, once again against her will.

N.G. testified that she now used "reverse psychology" in an attempt to placate Bailey and to emerge alive from her harrowing experience. She told Bailey that she had found him attractive ever since their days at MSU and that he did not need to use force. N.G. testified that after the second sexual episode, she feigned interest in Bailey and talked to

---

2. During the December 21 conversation, Bailey told N.G. that he lived at the Towers with some "home boys." When N.G. pressed him, Bailey admitted that this was not true and that he lived with his girlfriend.

3. While Bailey was still in the apartment, N.G. pushed the condom under the bed in order to

conceal it. Officers subsequently recovered the condom and it was admitted into evidence.

4. A police officer testified that, in checking out N.G.'s account, he had also successfully opened the locked bathroom door by using a similar identification card.

him in a friendly manner in the hope that this approach would forestall further abuse. Finally, Bailey left. N.G. then immediately called campus security and reported the rape to representatives of Howard University and of the Towers, and to several police officers who soon arrived on the scene.[5] Several individuals who observed N.G. shortly after the rape testified at the trial, and described N.G. as being nervous, agitated and even hysterical; the witnesses also noticed scratches and bruises on N.G.'s neck and arm.

N.G. was taken to the hospital, where she was thoroughly examined by Dr. Carol Ann Harper, a third year resident physician specializing in gynecology and obstetrics. Dr. Harper found significant evidence of trauma, consisting of several red abrasions on N.G.'s neck and one on her arm as well. Dr. Harper testified that these abrasions were not "hickeys" or "passion marks." [6] The witness was unable to determine, however, whether any sexual relations in which N.G. had engaged had been voluntary or involuntary.[7]

### B. *The defense.*

In his opening statement, which was made immediately after the prosecutor's opening and before the presentation of any evidence, Bailey's attorney told the jury:

> [The] evidence will show that yes, on the 23rd of December, 1993, my client was in [N.G.'s] apartment. Evidence will show that yes, there was sexual intercourse. But ... [w]e don't think that the government will provide you with ... credible evidence that this man forced himself on [N.G.]....

According to defense counsel, the evidence would show that after the two young people had sex, they discussed whether they would see each other in New York, and N.G. learned that "my client had no plan or intention or time to see [N.G.] in New York because he had his own personal life." Counsel implied that N.G. was disappointed that Bailey would not have a relationship with her, and that this disappointment led her to charge him, falsely, with rape.

The cross-examination of the complaining witness was designed to substantiate this contention. Bailey's attorney elicited from N.G. that she admitted Bailey into her apartment while she was clad in a nightgown and robe, and that she received him there notwithstanding her knowledge of his false representation two nights earlier that he lived with "home boys" rather than with his girlfriend. N.G. acknowledged that Bailey eventually sat on her bed and that she did not ask him to move from that position. Counsel further obtained from N.G. an admission that after the couple had intercourse for the second time, she showed Bailey some of her party dresses and asked his advice as to which one she should wear on New Year's Eve. The cross-examination also included the following:

Q. Did you at any time ask him if that event of the 23rd was going to be a one night affair?

A. When I was trying to tell him that I didn't—that he didn't have to force me, that he didn't have to force me, you know, I was just saying anything out of my mouth because he seemed to be feeding into it. And I was just like oh, you know, this better not be a one time deal.

Q. But you did tell him that?

A. Yes.

\*　　\*　　\*

---

5. N.G. stated that her assailant's name was Ari and she gave investigators a detailed description of him. She noted, *inter alia,* that he wore his hair in a "dreadlock" style. N.G. was unable, however, to provide Ari's last name.

6. A gynecological examination disclosed "no significant findings of gross trauma" in the area of N.G.'s vagina. The physician explained that this was not uncommon in sexual assault cases because the vagina can accommodate "fairly large volume without trauma."

7. The prosecution also presented certain evidence relating to conduct on the part of Bailey and his girlfriend which allegedly reflected consciousness of guilt. The defense case, which consisted primarily of the testimony of Bailey's girlfriend and of his mother, was devoted almost entirely to an attempt to neutralize this part of the prosecution's case. In light of our disposition of this appeal, it is unnecessary to discuss the evidence of consciousness of guilt.

Q. When you said what you said about not being a one night affair what was his response?

A. He was just like, oh, really, you know, I didn't have to force you, I didn't have to force you?

Q. But he did not make a commitment to you that that was not going to be a—one time thing, did he? Did you, did he tell you it was not going to be a one time thing?

A. Did he tell me that it was or it wasn't?

Q. Either way?

A. He didn't say anything.

Although the term "consent" was not used, defense counsel's strategy was obviously to persuade the jury that N.G. had sexual intercourse with Bailey willingly, and that she fabricated the charge of rape.

## C. *The motion in limine.*

Prior to trial, the government filed a "Notice of Intent to Introduce Other Crimes Evidence," in which it sought the court's permission to introduce evidence of a rape which Bailey had allegedly committed in Baltimore two months and six days before the sexual assault on N.G. The government proffered facts which were, in a number of respects, remarkably similar to N.G.'s allegations.[8]

At the beginning of the trial, the prosecutor stated that he proposed to introduce the evidence of the Baltimore rape only in rebuttal, and then only if Bailey raised a defense of consent. He told the judge that L.D.G. was present at the courthouse and was prepared to testify. The prosecutor made it clear that he would only seek to call L.D.G. to the stand if the court ruled that her testimony would be admissible.

The judge indicated that he would have to hold a hearing before allowing the prosecutor to introduce evidence of the Baltimore incident. The prosecutor agreed and, following further discussion, the judge reserved his ruling as to the admissibility of the "other crimes" evidence until after the nature of Bailey's defense became apparent. The judge stated that

> for all the government knows, and therefore [for] all the court knows, consent is not going to be a defense in this case.... If consent is an issue, I preliminarily am prepared to make the finding that, recognizing there is no law directly on point in this jurisdiction, I am prepared to make the finding that a rape that is substantially identical and coming close in time and

---

**8.** The government's proffer was as follows:

[L.D.G.] is a student at Morgan State University in Baltimore, Maryland. She knew the defendant when he attended Morgan State and had spoken to him last in May of 1993, right before graduation. (L.D.G. said she knew the defendant well enough only to say "hello" and "goodbye" to him.)

On Saturday morning, October 17, 1993, L.D.G. had gone to bed at about 6 a.m. (it was homecoming weekend). At 9 a.m. there was a knock on the door. It was the defendant, whom she had not seen in nearly six months. (L.D.G. did not give her address to the defendant. He presumably obtained her address from a third party.) She opened the door and asked him what he wanted. He said he wanted to talk. She said that she was sleeping, and asked him if he could come back later. He said that he was leaving for New York soon, and asked if he could come in for a few minutes. She allowed him in. He walked around her apartment, looking around, and then joined her on the sofa.

He asked for something to drink, and L.D.G. got him a glass of juice. They spoke for about 15 minutes, and then she asked him to leave. He tried to kiss her. L.D.G. told him that he had to leave, and she tried to push him toward the door. Suddenly the defendant pushed the door closed, grabbed L.D.G. around the neck, choked her, and dragged her to the bedroom. L.D.G. tried to struggle with him, but to no avail.

The defendant took her into the bedroom, and threw her on the bed where he ripped off her nightclothes, including her panties. He forcibly penetrated her vagina with his penis without a condom. L.D.G. managed to get him off of her by convincing him that she was pregnant. He eventually got off of her, got dressed, washed out his glass, and walked out without saying a word. As he left, he took $20 from the dresser.

L.D.G. immediately called a friend who took her to the hospital where they called the police. Physical evidence was recovered. Although [L.D.G.] did not know the defendant's last name, she identified him in a yearbook. L.D.G. gave a physical description of the defendant which included his shoulder-length dreadlocks and removable gold caps for his teeth. A warrant was issued for his arrest.

Subsequent investigation revealed that immediately after assaulting L.D.G., the defendant left Baltimore and travelled to Washington, D.C.

obviously also in place is relevant on the issue of this defendant's intent.

However, it needs to be proven to me outside the presence of the jury by clear and convincing evidence. . . .

There also may be some variation in the consent defense that I don't know about right now, which will wipe out entirely once I hear the variation on the consent . . . defense.

(Emphasis added.)

The matter was addressed again after the government had rested. At that time, the prosecutor raised an issue regarding certain prospective defense witnesses, and a somewhat confusing exchange ensued:

MR. SPAGNOLETTI: [9] If I may raise one issue, Your Honor, the list of witnesses that the defense gave me includes a number of people through my investigation that have to do only with the event in Baltimore.

THE COURT: I am going to—I fully intend to limit what can be asked of these witnesses. And just be ready to jump up and object.

MR. SPAGNOLETTI: Very well, Your Honor.

THE COURT: I am not discussing this matter any further, Mr. Oyewole.[10] You never told me who these witnesses are. Call your first witness. Call your first witness.

MR. OYEWOLE: The subpoena had been suspended.

THE COURT: I have ruled. I have ruled. Call your first witness.

MR. OYEWOLE: From day one the court reserved the right—the decision [relating] to Baltimore.

THE COURT: Baltimore didn't come in yet.

MR. OYEWOLE: At this point [it] comes in if I put in the defense of consent, that's what—

THE COURT: I said yes if you put on a defense of consent I am definitely letting the Baltimore matter in. And you both knew that. No question about it. No question about it. All right.

MR. OYEWOLE: We object to that.

THE COURT: That is fine. You already have and I have already ruled.

The judge did not repeat his earlier reference to the requirement that the prosecution prove by clear and convincing evidence that the uncharged conduct occurred. Instead, he directed Bailey's attorney to proceed immediately with the defense case.

D. *Closing argument and the court's instructions.*

In the wake of the judge's ruling, Bailey elected not to testify, and the defense presented no evidence relevant to the issue of consent. After the defendant rested, the prosecutor asked the court to preclude Bailey's attorney from contending in his closing argument that the sexual relations between Bailey and N.G. were consensual. The judge indicated his agreement, stating that "I have heard not one tiny piece of evidence on consent." [11] Remarkably, and notwithstanding the entire thrust of his defense, Bailey's attorney responded: "The court is correct, Your Honor." The judge told defense counsel that "[y]ou can argue that the government had not proven the scenario that they are going to be proposing beyond a reasonable doubt."

In the latter part of his closing argument, the prosecutor told the jury that, under the court's anticipated instructions, "if [N.G.] submits to having sex with Mr. Bailey because she has been threatened, forced, or made in fear of serious bodily harm, that is not consent." The prosecutor then elaborated on this contention. Bailey's attorney requested a bench conference, and told the judge that because the prosecutor had "interjected" consent, "I think the court should allow me at least to address that." The

---

9. Robert J. Spagnoletti, Esq., Assistant United States Attorney, was the prosecutor in this case.

10. G. Godwin Oyewole, Esq., represented Bailey at trial and is also Bailey's counsel on appeal.

11. The judge stated that "our discussions of consent earlier on in this trial were all based on the proposition that I thought the defendant was going to come up with some evidence of . . . consent. . . . But now I see there is zero evidence on the subject of consent."

judge denied the request, stating that the prosecutor "absolutely did not raise it."

In his closing argument, defense counsel focused primarily on N.G.'s credibility. He also appeared to argue misidentification, noting that many people have dreadlocks and that N.G. failed to report the gold caps on Bailey's teeth. He asserted that "nothing that day according to the evidence has tied really my client particularly beyond a reasonable doubt to the rape of [N.G.]."[12] Counsel made no attempt to resurrect the theory at which he had so broadly hinted in his opening statement and in cross-examination, namely, that N.G. was motivated by revenge and that she had falsely charged Bailey with rape.

The judge instructed the jury, in pertinent part, that

> [t]he charge in this case is rape. The essential elements of the offense of rape, each of which the Government must prove beyond a reasonable doubt are one, that the defendant had sexual intercourse with the complaining witness; and two, that the act was committed forcibly and against her will.

After deliberating for a very short time, the jury found Bailey guilty. Bailey was sentenced to imprisonment for a period of fifteen to forty-five years. This appeal followed.

## II.

### LEGAL DISCUSSION

A. *General considerations.*

This case comes to us in a somewhat unusual posture. In the trial court, the prosecutor argued, and the judge evidently held, that if the defendant testified, and if he claimed on the stand that N.G. consented to have sexual relations with him, then (and apparently only then) the government would have the right, on rebuttal, to introduce evidence of the alleged Baltimore rape. In our view, however, the defendant effectively raised the issue of consent early in the trial, and his decision whether or not to testify was by no means dispositive of the admissibility of the Baltimore evidence.

In his opening statement to the jury, Bailey's attorney admitted that his client had sexual intercourse with N.G. at the time and place alleged in the indictment. With that acknowledgment, the only remaining issue was whether, as alleged by the government, the defendant's sexual acts were committed forcibly and against N.G.'s will. If the prosecution failed to prove that allegation, then there was no proof of rape. Bailey's entire strategy, from opening statement through his cross-examination of the complaining witness, was designed to establish that N.G. was lying when she testified that the sexual activity was not consensual.

A defendant need not take the stand in order to place an issue into controversy. Where the defense has not presented evidence, "the court may look to the defendant's opening statement, relevant cross-examination, and the representations of defense counsel" to determine whether an issue is being contested. *Landrum v. United States,* 559 A.2d 1323, 1328 (D.C.1989); *see also Jefferson v. United States,* 587 A.2d 1075, 1078–79 (D.C.1991). Bailey's opening statement, the cross-examination of N.G., and defense counsel's representations[13] unambiguously communicated to the court and jury that the sole contested issue was whether Bailey forced N.G. to have sex with him against her will. For all practical purposes, the question for the jury was whether N.G. consented. Because the trial judge and the attorneys did not see the issue in that way, however, the prosecution's right to introduce evidence of the alleged Baltimore rape was inappropriately made to hinge on whether or not Bailey testified.

As the case is presented to us, the substantive legal issue is whether, if Bailey had testified that N.G. consented to have sex with

---

12. The reader will recall that, in his opening statement, defense counsel acknowledged that Bailey had had sexual intercourse with N.G. in her apartment.

13. Aside from his opening statement, Bailey's attorney represented to the court: "We are not denying that my client was in the apartment." He also stated that identification "will not be a defense, Your Honor."

him, this testimony would have opened the door to reception of the Baltimore evidence, on the theory that Bailey's conduct at MSU tended to shed light on the question whether he intended to have sex with N.G. against her will. Given the remarkable similarities between the two incidents [14] the prosecution presented a formidable case on the merits of this issue. The parties agree, however, that there is no dispositive decision in this jurisdiction, and the courts elsewhere are sharply divided.[15] The government contends that we need not reach the substantive issue because, under the reasoning of *Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984) and its progeny, Bailey has not preserved the issue for appeal. We are disposed to agree.

### B. *Luce and its progeny.*

In *Luce,* the defendant was on trial on a federal narcotics charge. He requested the district judge, *in limine,* to preclude the prosecutor from impeaching him with a prior conviction. *See* Fed. R. Evid. 609(c). The trial judge denied the motion. The defendant did not take the stand, and the jury found him guilty. On appeal from his conviction, the defendant challenged the trial judge's denial of his motion *in limine.* The Court of Appeals affirmed. The Supreme Court, resolving a "conflict among the circuits," *Luce, supra,* 469 U.S. at 39, 105 S.Ct. at 462, unanimously affirmed the judgment of the Court of Appeals.

Speaking through Chief Justice Burger, the Court gave three essential reasons for its decision. First, the Court noted that any possible harm from the trial judge's denial of the *in limine* motion was "wholly speculative," for the ruling was "subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer." *Id.* at 41, 105 S.Ct. at 463. The Court observed that if the government's case was strong, the prosecutor might elect not to use an arguably inadmissible prior conviction for impeachment. *Id.* at 42, 105 S.Ct. at 463–64.

Second, the Court stated that "[b]ecause an accused's decision whether to testify seldom turns on the resolution of one factor . . ., a reviewing court cannot assume that the adverse ruling motivated a defendant's decision not to testify." *Id.* (citation and internal quotation marks omitted). The Court pointed out that any commitment by the defendant to take the stand was effectively unenforceable. *Id.*

Finally, the Court observed that the defendant's position tended to circumvent the "harmless error" doctrine. Chief Justice Burger explained that if *in limine* rulings under Rule 609(a) were reversible on appeal,

---

**14.** *E.g.,* in each case, Bailey allegedly came to the room of a female acquaintance whom he knew only slightly. On both occasions, he learned the complainant's address from a third party, and he arrived on the scene unexpectedly, in the morning, without calling ahead of time. In each case, the victim was a student. Bailey induced both women to admit him by indicating that he would only be staying briefly. On each occasion, he asked the woman for something to drink. His assault on each woman was sudden and violent, and he choked both of his victims. He ripped off and tore both women's undergarments. Finally, after each incident, Bailey travelled to another city. Both assaults were thus apparently timed to make it easier for Bailey to avoid apprehension.

**15.** *Compare, e.g., Rubio v. State,* 607 S.W.2d 498, 501 (Tex.Cr.App.1980) (en banc) (testimony as to an uncharged sexual assault committed in the same general manner and time frame as the offense for which the defendant was being prosecuted was admissible to show that the defendant "intended to have sexual intercourse with the prosecutrix in the instant case without her con-

sent by means of force and threats"); *and Davis v. State,* 635 P.2d 481, 485 (Alaska App.1981) (where defendant testified that intercourse with complaining witness was consensual, he placed his intent in issue, so that "the highly probative nature of the evidence concerning recent, similar assaults by Davis is manifest, and the trial court's decision allowing the evidence to be heard by jury was not an abuse of discretion"); *with Brown v. State,* 459 N.E.2d 376, 379 (Ind.1984) ("in rape cases where the act charged has been proved or admitted, the defendant has interposed a defense of consent, and the only issue is the consent of the prosecutrix, evidence of prior rapes is not admissible"); *and Lovely v. United States,* 169 F.2d 386, 388–91 (4th Cir.1948) (Parker, J.) (in rape prosecution, where intercourse was admitted and only issue was whether complaining witness consented, evidence that accused raped another woman several weeks prior to charged offense was inadmissible to prove identity, intent, motive, common scheme or plan, or guilty knowledge).

"almost any error would result in the windfall of automatic reversal; the appellate court could not logically term 'harmless' an error that presumptively kept the defendant from testifying." *Id.* The Court concluded that

> [t]he preferred method for raising claims such as [petitioner's] would be for the defendant to take the stand and appeal a subsequent conviction.... Only in this way may the claim be presented to the reviewing court in a concrete factual context.

*Id.* at 43, 105 S.Ct. at 464 (quoting *New Jersey v. Portash,* 440 U.S. 450, 462, 99 S.Ct. 1292, 1298–99, 59 L.Ed.2d 501 (1979) (Powell, J., concurring)).

Justices Brennan and Marshall, in a brief concurrence written by the former, joined the opinion of the Court. They noted, however, that in cases "in which the determinative question turns on legal and not factual considerations, a requirement that the defendant actually testify at trial to preserve the admissibility issue for appeal might not necessarily be appropriate." *Id.* at 44, 105 S.Ct. at 464.

This court has had two recent occasions to consider the *Luce* doctrine. In the first of these cases, *Butler v. United States,* 688 A.2d 381 (D.C.1996), the judgment of the court was unanimous, but there was disagreement between two concurring judges about the degree to which the court was adopting the reasoning of *Luce. See id.* at 389 (opinion of Ferren, J.); *id.* at 398 (opinion of Newman, J.). The opinions in *Butler* speak for themselves, and we will not dissect them further, except to note Judge Newman's opening comment:

> I would make explicit what Judge Reid's opinion clearly implies. We adopt *Luce* ... with the limitation provided in the

concurrence of Justice Brennan, joined by Justice Marshall.

*Id.* at 398.

In *Wilson v. United States,* 691 A.2d 1157 (D.C.1997) (per curiam), the defendant requested a ruling, *in limine,* that although he could be impeached with his prior conviction for murder, the fact that the conviction was for murder should not be disclosed to the jury. He asked that the jurors be advised, instead, that he had been convicted of a serious felony. Although the defendant did not testify, the court reached the merits of the defendant's contention and affirmed the judgment. The court addressed the *Luce* issue in the following footnote:

> In *Butler v. United States,* [*supra*], we applied *Luce* principles in a case where the defendant did not testify, but where the trial court's *in limine* ruling did "not represent the trial court's complete and final decision regarding the use of prior arrests to impeach [the] defendant ..." and where "the trial court cannot reasonably rule on the *in limine* motion on the basis of the proffered testimony." 688 A.2d at 388. Wilson's case is different because the trial court made a definitive ruling that if Wilson testified, the government would impeach him with his specific prior conviction. *Under Butler, where a challenged pretrial ruling turns solely upon a legal consideration on which the trial court has made a final ruling,* and the testimony of the defendant is not essential to preserve the purely legal issue for appellate review, it is ripe for consideration by this court.

*Id.* at 1158–59 n. 3 (emphasis added). Although the quoted footnote is not dispositive here, we think that it appears to be consistent with the approach of Justices Brennan and Marshall in *Luce* and of Judge Newman in *Butler.*[16] We do not believe that this court should lightly reject even non-binding decisions of the Supreme Court,[17] especially where, as here, they are unanimous.[18] Ac-

---

**16.** In *Wilson,* the court did not discuss the parts of the *Luce* opinion dealing with an appellate court's inability to determine why a defendant failed to testify or with the evasion of the "harmless error" doctrine.

**17.** We are not bound to follow the Supreme Court's non-constitutional rulings on the law of

evidence. *See, e.g., Robinson v. United States,* 623 A.2d 1234, 1241 n. 9 (D.C.1993).

**18.** Justices Brennan and Marshall, as we have noted, joined Chief Justice Burger's opinion for the Court.

cordingly, and notwithstanding Judge Ferren's thoughtful criticisms of *Luce* in his concurring opinion in *Butler, supra,* 688 A.2d at 389–98, we are disposed, so far as our precedents permit, see note 20, *infra,* to follow the Supreme Court's holding in that case, subject to the proviso set forth in Justice Brennan's separate opinion.

## C. *The Luce factors applied.*

We now apply to the record before us the Supreme Court's reasoning in *Luce.*

### (1) *Speculative nature of the harm.*

In this case, as in *Luce,* any harm to the defendant flowing from the judge's *in limine* ruling was speculative. We reach this conclusion for several reasons.

First, notwithstanding the trial judge's remark that if a consent defense was raised, "I am definitely letting the Baltimore matter in," this ruling could not have been as conclusive as it sounded. As the judge had previously stated, the uncharged criminal conduct "needs to be proven to me outside the presence of the jury by clear and convincing evidence." *See, e.g., Daniels v. United States,* 613 A.2d 342, 346–47 (D.C.1992). Before permitting the government to present evidence regarding the Baltimore incident to the jury, the judge would therefore have been obliged to require the prosecution to make the necessary preliminary showing to the court. Defense counsel had listed several witnesses who were prepared to testify on Bailey's behalf in regard to the Baltimore allegations. Although a finding of clear and convincing evidence can apparently be based on a government proffer, *id.* at 347, we can only speculate as to what the proffered defense witnesses would have said, and what findings the trial judge would have made. Accordingly, in spite of the definitive tone of the judge's pronouncement on the subject, the actual reception into evidence of the alleged rape in Baltimore remained uncertain.

Moreover, even if we were to take the judge at his final word on the subject and presume that he would have admitted the Baltimore evidence without the required "clear and convincing" showing, we cannot know whether, in the crunch, the government would actually have used it. If Bailey had in fact testified, the prosecutor's subsequent tactics would surely have depended in substantial part on Bailey's persuasiveness (or lack thereof) as a witness. If Bailey provided potentially persuasive testimony that N.G. consented, then the government could be expected to introduce, in rebuttal, testimony regarding the alleged rape in Baltimore. If, on the other hand, Bailey's testimony had come across as incredible, the prosecutor might well have decided not to introduce into the record material which would bring with it a potentially thorny appellate issue, and which would thus have created the danger that a conviction would be reversed on appeal. *Accord, Luce, supra,* 469 U.S. at 42, 105 S.Ct. at 463–64.[19] Finally, without knowing what Bailey's testimony would have been, we cannot determine whether it would have affected the admissibility of evidence of the Baltimore rape (*e.g.,* Bailey might have claimed that he had never had sexual relations with *anyone* without the consent and encouragement of his partner, thus arguably opening the door).

### (2) *Whether Bailey would have testified.*

As the Supreme Court noted in *Luce,* a defendant's decision whether to take the stand "seldom turns on the resolution of one factor." 469 U.S. at 42, 105 S.Ct. at 463. This is especially true in Bailey's case.

Bailey's encounters with N.G. and with L.D.G. were not his first brushes with the law. On May 8, 1990, when he was twenty years of age, Bailey had been convicted in Virginia of the offense of petit larceny. If he had taken the stand, he could have been impeached with this conviction. *See* D.C.Code § 14–305 (1996).

---

**19.** It is worth noting, in this connection, that the prosecutor could reasonably have argued to the court that the issue of consent had been raised in defense counsel's opening statement and in the cross-examination of N.G., and that the Baltimore evidence was therefore admissible as a part of the government's case-in-chief. Whether the prosecutor's failure so to argue was based on tactical considerations is unclear.

Further, upon his arrest for the instant offense, Bailey allegedly told police officers that he was not acquainted with N.G. and that he knew nothing about any incident in Baltimore. He made these statements before the officers had advised him of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Bailey moved to suppress these statements, and the prosecutor essentially conceded a *Miranda* violation, stating that the government would not introduce evidence of the statements in its case-in-chief. The court held, however, that the statements were voluntary, and they could thus have been used to impeach Bailey in the event that he had decided to testify. *See Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). By taking the stand, Bailey would thus have invited disclosure to the jury that he apparently lied to the police about the incident for which he was on trial. Here, as in *Luce*, we simply "cannot assume that the adverse ruling motivated [the] defendant's decision not to testify." 469 U.S. at 42, 105 S.Ct. at 463.[20]

(3) *Evasion of "harmless" error on review.*

If we were to review the trial judge's *in limine* ruling, and if we were to conclude that the ruling was erroneous, the limited record before us would preclude us from determining whether the error was prejudicial or harmless. Thus, "if the defendant declines to testify, the reviewing court is handicapped in making the required harmless-error determination should the [trial] court's *in limine* rule prove to have been

incorrect." *Luce, supra,* 469 U.S. at 43, 105 S.Ct. at 464 (Brennan, J., concurring).

(4) *Legal or factual question.*

Because of the many factual uncertainties on which the ultimate admission of the evidence of the Baltimore rape would necessarily hinge, the present case does not present a "purely legal issue for appellate review." *Cf. Wilson, supra,* 691 A.2d at 1159 n. 3. The proviso in Justice Brennan's opinion on which the court evidently relied in *Wilson* therefore has no application here.

## III.

## CONCLUSION

■ Applying the *Luce* doctrine to the present case, we conclude that Bailey has not preserved for appeal the question whether the trial judge correctly ruled on the government's motion *in limine* regarding the evidence of the alleged rape of L.D.G. in Baltimore. Accordingly, Bailey's conviction is hereby

***Affirmed.***[21]

---

**20.** In *Johns v. United States*, 434 A.2d 463, 468 & n. 6 (D.C.1981), this court stated, over the dissent of Judge Pryor, and without further elaboration, that it was sufficient for the defendant to demonstrate that the court's *in limine* ruling "contributed" to her decision not to testify, and that she need not prove that it was the "sole reason." Although this decision predated *Luce* and now bears revisiting, especially in light of *Butler*, 688 A.2d at 388 (quoting relevant language from *Luce*), we are presently bound by *Johns.* We therefore conclude that the existence of other motivations for Bailey not to testify, standing alone, would not be dispositive of the question whether Bailey has preserved for appeal the correctness of the order *in limine.* We do not think,

however, that *Johns* precludes us from considering the uncertainty whether Bailey would have declined to testify even in the absence of the *in limine* order as one factor contributing to the hypothetical nature of the harm that Bailey claims to have suffered.

**21.** Bailey also contends that the evidence was insufficient to support his conviction and that the judge erred in denying his motion for judgment of acquittal. This contention is without merit. *(Alfred) Johnson v. United States,* 613 A.2d 888, 897 (D.C.1992); *(Barrington) Johnson v. United States,* 138 U.S.App. D.C. 174, 177, 426 F.2d 651, 654 (1970) (en banc).