James E. BRISBON, Appellant

v.

UNITED STATES, Appellee.

No. 03–CF–318.

District of Columbia Court of Appeals.

Argued March 2, 2005.
Decided March 23, 2006.

---

Eve Hanan, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Suzanne C. Nyland, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and John J. Manning and Emory V. Cole, Assistant United States Attorneys, were on the brief, for appellee.

Before REID, Associate Judge, and BELSON and TERRY, Senior Judges.*

---

* Judge Terry was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on February 1, 2006.

TERRY, Senior Judge:

Appellant was indicted for first-degree murder while armed, possession of a firearm during a crime of violence ("PFCV"), carrying a pistol without a license ("CPWL"), possession of an unregistered firearm ("UF"), and unlawful possession of ammunition ("UA"). A jury acquitted appellant of first- and second-degree murder while armed and UA, but found him guilty of the lesser included offense of voluntary manslaughter while armed, as well as the other three weapons offenses. On appeal from the judgment of conviction, appellant presents two claims of error. We reject one but find partial merit in the other. We hold that the trial court erred in refusing to admit the testimony of a defense witness, Calvin Brown, about an excited utterance made by appellant. Because this error was not harmless, we reverse the judgment and remand the case for a new trial.

I

On February 1, 2000, police officers found Michael Butler lying dead in an alley with a gunshot wound to the back of his head. Appellant was arrested several weeks later and charged with his murder.

A. *The Government's Evidence*

At approximately 8:00 p.m. on February 1, 2000, Charlene Smith was standing on the sidewalk in the 4600 block of Hillside Road, Southeast, conversing with appellant.[1] The only other person in sight at the time was Bernard "Pee–Wee" Coleman, who stood nearby but did not participate in the conversation. While Ms. Smith and appellant were talking, Mr. Coleman alerted them to the fact that "somebody was out back," whereupon appellant unzipped his coat, adjusted a gun at his waistband, and walked into a nearby alley. Coleman and Smith remained where they were. Ms. Smith then heard "more than two" gunshots, but she did not hear anyone screaming, arguing, or running before or after the shots were fired. Appellant then returned from the alley and said, "Ha, ha, now you know what happened. It might could happen to you and your kids."[2] Ms. Smith testified that appellant's demeanor was the same before and after he went into the alley. After appellant returned, she left him standing outside and went into her home across the street.[3]

Cynthia Tate testified that she was at James McBride's apartment on Hillside Road when she heard gunshots shortly after 8:00 p.m. She went outside and, from a distance of about twenty-five feet, saw appellant[4] standing in the alley with a gun in his hand, approximately two feet from a

1. Ms. Smith admitted that she drank two forty-ounce bottles of beer and a pint of gin that day, and that she smoked "a lot" of crack cocaine that evening and may also have used PCP.

2. Ms. Smith at different times gave different versions of appellant's statement. Detective Michael Baylor testified that his police interview notes indicated that Smith told him appellant said, "Now you know," or "Now you know what's up." In a letter dated March 8, 2000, a portion of which was read to the jury, Ms. Smith wrote to the police that appellant said, "Ha, ha, now you know if you say something, it might be you or your kids ...."

3. Detective Baylor later testified that Ms. Smith told him that appellant drove away from the scene in a black car.

4. Ms. Tate stated on direct examination that she and appellant "grew up together." On cross-examination, however, she admitted that she had actually gone to school with appellant's father, not appellant. At the time of trial, Ms. Tate was forty-three years old, and appellant was twenty-five.

body which was lying on the ground.[5] Ms. Tate said she did not hear anyone arguing or see anyone else nearby. She then went back inside Mr. McBride's apartment. On cross-examination, Ms. Tate admitted that she was under the influence of crack cocaine on the night of the shooting. She said she had smoked "a lot" of crack, but claimed it made her "more alert." [6]

When Officer Paul Riggins arrived on the scene a few minutes later, he found Michael Butler lying face down on the ground and called an ambulance. The officer did not see anyone else in the vicinity. When the ambulance arrived, the emergency medical technicians examined Butler's body and determined that he was dead. Riggins then searched the body and found a gun in Butler's right coat pocket, which he left there.

Officer Dwayne Mitchell, a crime scene technician, processed the scene and found four latex gloves: two in a dumpster in the alley,[7] one on the ground next to Butler's left hand,[8] and one in Butler's left coat pocket. He also removed from Butler's right coat pocket a nine-millimeter semi-automatic handgun with one round in the chamber.[9] In addition, he seized a black knit cap and a grey hooded sweatshirt which Butler was wearing, both of which bore bullet holes. The next day Mitchell returned to the alley and found a spent cartridge [10] and a set of keys.

The medical examiner, Dr. Marie Lydie Pierre–Louis, conducted an autopsy and concluded that Butler died from a single gunshot wound to the back of his head. She recovered a bullet from Butler's brain.[11] She also opined that Butler's death was "quick," and that it would have been a "great miracle" if he had been able to walk after being shot. Dr. Pierre–Louis noted an abrasion above Butler's right eyebrow, which she said was consistent with an unbroken fall. In addition, she found that Butler had both alcohol and PCP in his system. Finally, the doctor testified that there was no evidence indicating that Butler had been shot at close range.[12]

Finally, Detective Michael Baylor testified that, when he arrested appellant for

5. Ms. Tate gave inconsistent accounts of where she was when she saw appellant: beside a fence, inside the apartment looking out a window, and standing next to a dumpster. In addition, she testified before the grand jury that when she saw appellant, she was only five feet away from him, not twenty-five feet as she said at trial.

6. Contrary to her trial testimony, Ms. Tate told a defense investigator that she did not recall what she saw that evening because she was under the influence of drugs.

7. A fingerprint examiner testified that there were five usable fingerprints on the gloves found in the dumpster, but none matched the prints of either appellant or Butler.

8. Butler's grandmother testified that Butler wore latex gloves to avoid developing blisters on his left hand, which was disabled as a result of injuries he sustained while trying to break up a knife fight. The medical examin-

er, however, found no injuries to either of Butler's hands.

9. No usable fingerprints were recovered from the gun.

10. Officer Michael Mulderig, a firearms expert, later testified that this cartridge did not come from the gun recovered from Butler's coat pocket.

11. Officer Mulderig also testified that this bullet did not come from the gun in Butler's pocket. However, he could not determine whether the cartridge found in the alley and the bullet taken from Butler's head were related to each other, or whether they were fired from the same gun.

12. This was later confirmed by Officer Rosolyn Brown, another firearms expert, who said that she did not find any evidence of a shot being fired at close range.

Butler's murder on April 28, almost three months later, appellant said that he knew nothing about the shooting and was not there when it happened.

### B. *The Defense Evidence*

The defense offered a significantly different version of events.

Testifying on his own behalf, appellant presented a claim of self-defense. On the evening of February 1, he said, he was visiting Quantrese Jones, who also lived in the 4600 block of Hillside Road. At about 8:00 p.m. he went to get his car, which was parked nearby on Easy Place. After leaving Ms. Jones' apartment, he took a short-cut to Easy Place through the alley behind Ms. Jones' building. His friend Bernard Coleman was entering the building just as appellant came out, but Coleman did not tell him anyone was in the alley. Appellant also said he did not see either Ms. Smith or Ms. Tate that evening, nor did he threaten Ms. Smith or her children.

As appellant proceeded through the alley with his car keys in his hand, he saw a man lying on some steps who he assumed was a local man known as "Forty," who "always stays drunk." When appellant told him to move, this man, who in fact was not Forty, "jumped up," with his hood pulled tightly around his face, and put a gun to appellant's head. The man told appellant to "get down," but he did not, because he was "shocked" and "froze for a second." Then a second man appeared from behind a dumpster in the alley and "walked around ... and stood ... right at the top of the steps." He pointed a gun at appellant and said, "Hit him, hit him," which appellant interpreted as a directive to shoot him. Thinking the two men were trying to rob him, appellant told them, "I ain't got nothing," and tried to grab the gun from the first man, who was still holding it to appellant's head. A struggle ensued, and the man dropped the gun and ran, but stopped farther down the alley. The second man still stood at the top of the steps, pointing a gun at appellant, and yelled, "Get that [expletive]." Appellant thought this second man—Butler—was going to shoot him, so he bent over to pick up the gun the first man had dropped. Then, while he was still "leaning down," appellant "just shot it" once and dropped it.

After the incident in the alley, appellant ran back to Ms. Jones' apartment, where he saw and spoke to Bernard Coleman. He then ran to the nearby home of another friend, Calvin Brown, and asked Brown to give him a ride to his car. Brown drove him to his car, but then appellant realized he did not have his keys, so he asked Brown to take him home.

Appellant stated that he did not find out until the next day that the man he shot in the alley was dead. He said that the last thing he saw before he fired the shot was the second man standing at the top of the steps, pointing a gun at him,[13] but he did not look at the man after firing because he was running away. Appellant did not go to the police to report the incident because he feared they would not believe him. When he was arrested in April, he told the police that he did not know about the shooting. At trial, however, he admitted that this was a lie.[14]

James McBride testified that Ms. Tate told him she found "the" gun in the alley

---

**13.** Later, during his rebuttal testimony, Officer Mitchell said that the distance between the steps where appellant claimed to have seen Butler standing and the place where the body was found was forty-six feet.

**14.** During the government's rebuttal, appellant's mother testified that he also told her he did not know anything about the shooting.

and sold it. But when Tate said she found it "in the back," McBride did not know whether she meant she found the gun at the crime scene after the shooting occurred, or whether her discovery of the gun "coincided with the shooting." Steve Baugham testified that Butler was one of two armed robbers who had robbed him and a female companion in November 1999, about three months earlier. Finally, Officer Carlton Herndon testified that he had arrested Butler in August 1998 for possession of a shotgun.

### C. Excluded Testimony

To reinforce appellant's story that he acted in self-defense, defense counsel sought to introduce—through appellant, Coleman, and Brown—appellant's statements regarding what happened in the alley as "excited" or "spontaneous" utterances.[15] First, appellant testified that when he ran into Coleman on his way out of the alley, he told Coleman that someone tried to rob him. Appellant's testimony was stricken, however, after the court determined that, although his statement was made within moments of a startling incident, he could not testify as to his own self-serving, exculpatory statement. The court also ruled that appellant's testimony, standing alone, was insufficient to establish the statement's spontaneity and sincerity, and that "some corroboration" had to be provided.

Bernard Coleman testified that he saw appellant leaving Ms. Jones' apartment on the evening of February 1. He said that he did not see appellant again that evening, that appellant did not say anything to him, and that appellant looked the same that night as he did in court.[16] He also stated that he did not see appellant talking to Charlene Smith that evening. Coleman was impeached with a statement he made to defense investigators that appellant told him that "somebody shot him up . . . somebody tried to rob him." That statement was stricken, however, as unresponsive to the question that produced it. The trial court ultimately ruled that any statement appellant made to Coleman about self-defense could not come in through Coleman because he did not verify that the statement was made, nor did he corroborate appellant's own account of his demeanor that evening. Appellant does not challenge this ruling on appeal.

Calvin Brown testified that he and appellant had been friends for more than twenty years. He said that appellant came to his house on 46th Place, Southeast, on the evening of February 1 looking "hysterical," "scared," and "terrified." Defense counsel then told the court at a bench conference that she wished to "elicit the excited utterance" from Brown. The court said that Brown had not testified about the time lapse between the traumatic event (i.e., the shooting) and the statement, and counsel responded that only appellant could give that information,[17] since

---

**15.** The Federal Rules of Evidence contain a hearsay exception for "excited utterances." See FED. R. EVID. 803. The District of Columbia courts have adopted this exception, but more often refer to the statements as "spontaneous" utterances. See, e.g., Smith v. United States, 666 A.2d 1216, 1221–1222 (D.C.1995). The terms are used interchangeably in this opinion.

**16.** Coleman said that on the night in question appellant looked "like how he looks now."

He later admitted, however, that he had previously told defense investigators that appellant looked "excited and nervous."

**17.** Appellant had testified as to the route he took to get to Brown's home, but had given no estimate of the time it took to complete the trip.

"Brown ... can't say how far it was after the event." The court then ruled that appellant's statement could not come in through Brown because "[appellant] himself set the time parameters," and also because Brown was "not a disinterested witness" but a longtime friend of appellant.[18]

Appellant also testified that he did not contact the police to tell them what had happened because he did not think they would believe him. He then began to describe an earlier episode in which he had seen his best friend murdered and had flagged down the police, but the prosecutor objected to this testimony as "improper and irrelevant." When defense counsel explained that appellant was trying to convey why he had problems with the police, the prosecutor responded that such testimony "[m]ight open the door to other things ...."

At a bench conference, defense counsel proffered that appellant would testify that his best friend was shot, and that when he found the body and flagged down the police, they treated him as a suspect. According to counsel, this testimony was offered to show appellant's state of mind, to explain why he did not contact the police about the alleged attempted robbery in the alley, and to rebut the government's anticipated argument that his failure to contact the police was evidence of his consciousness of guilt. The court then said that if the testimony came in to explain that appellant did not contact the police because he had had bad experiences with them, the government would be allowed to elicit evidence that appellant "didn't tell the police because he knows that he has some problems with his own conduct with the police."

Defense counsel argued that appellant's testimony would not open the door to other conduct with the police, but the court replied that it would.

Defense counsel then asked what "parameters" the court would set, and the court responded that the government would not be permitted to explore every contact between appellant and the police, but would at least be allowed to show that appellant had "some negative contact with the police, not negative from his point of view but negative from the police officer's point of view." When counsel asked again about "parameters," the following occurred:

> [DEFENSE COUNSEL]: ... Would they be allowed to do anything they wanted, to ask any questions they wanted?
>
> THE COURT: I didn't say that.
>
> [DEFENSE COUNSEL]: Before we decide whether we want to withdraw this question, I think the area needs to be explored.
>
> THE COURT: We will do that, and we will explore it out of the presence of the jury.
>
> [DEFENSE COUNSEL]: Okay.

Back in open court, defense counsel said, "I withdraw that question for right now." No further testimony was elicited by the defense on this issue, and counsel did not raise it again.

## II

Appellant contends that his statements to the effect that two men tried to rob him in the alley were spontaneous utterances and should have been admitted, either through his own testimony or through that of Calvin Brown. He also argues that his

---

18. After defense counsel objected to the exclusion of Brown's testimony, the court emphasized this particular point, stating: "His particular problem, as I see it, is this. He is not an independent witness. He's not a witness that has no connection. He's the man's friend."

constitutional rights were violated when the trial court ruled that he could not explain his reason for failing to report the alleged robbery to the police without "opening the door" to evidence of his prior contacts with the police. These errors, appellant maintains, "substantially influenced that jury's verdict by foreclosing the defendant's presentation of evidence crucial to his defense" and, for that reason, "require reversal." With regard to the first argument, we hold that the court properly disallowed appellant's testimony regarding his own excited utterance, but erred in excluding Mr. Brown's testimony on the same subject. We reject the second argument because it is precluded by *Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984).

### A. *Appellant's "Excited Utterances"*

Appellant claims that, within a short period of time after the shooting in the alley, he told Bernard Coleman and Calvin Brown that two men tried to rob him. The trial court prohibited all three—appellant, Coleman, and Brown—from testifying about those statements.[19] Appellant maintains that the court's decision was "based on the erroneous legal conclusion that statements should not be admitted if they are 'self-serving' or presented to the court through a witness who is not 'disinterested.'" We agree with appellant, but only to the extent that his argument applies to the proffered testimony of Mr. Brown.

■ This case involves two potentially contradictory principles of the law of evidence. The first is the general rule that "[w]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." *United States v. Marin,*

669 F.2d 73, 84 (2d Cir.1982). The second is the well-established proposition that a declarant's prior statement is admissible, under certain circumstances, as an "excited" or "spontaneous" utterance, a well-recognized exception to the hearsay rule. *E.g., Smith v. United States,* 666 A.2d 1216, 1221 (D.C.1995). "There are three basic requirements for admission as a spontaneous utterance: (1) a serious occurrence which causes a state of nervous excitement or physical shock in the declarant, (2) a declaration made within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it, and (3) the presence of circumstances which, in their totality, suggest spontaneity and sincerity of the remark." *Id.* at 1222. Because the decision whether a statement is admissible as a spontaneous utterance "depends on the particular facts of each case" and is thus a discretionary matter, this court reviews such matters only for abuse of discretion. *Id.* We will reverse a decision either to admit or to exclude a spontaneous utterance only if that ruling is clearly erroneous. *See Reyes–Contreras v. United States,* 719 A.2d 503, 505–506 (D.C. 1998); *Lyons v. United States,* 683 A.2d 1080, 1083 (D.C.1996).

■ The trial court's decision to exclude appellant's testimony about his own statements to Mr. Coleman when he encountered him just after the shooting was based on two findings: first, that there was no evidence corroborating appellant's testimony, and second, that appellant's testimony was inherently unreliable because he had an incentive to lie, namely, the fact that he was facing a very serious charge. Appellant argues that "the trial judge er-

---

**19.** Appellant does not claim error in the court's decision to exclude Coleman's testimo- ny on this subject.

roneously prevented [him] from testifying to his excited utterance based on the incorrect legal conclusion that a defendant's interest in the case automatically defeats admissibility." He also asserts that "the judge's remark that the statement was uncorroborated was both factually and legally erroneous."

As the government correctly points out in its brief, "this court has not explicitly addressed to what extent the excited utterance analysis is impacted by the facts that (1) the declarant happens to be the defendant, and (2) the statement is exculpatory . . . ." We have found no case law from this jurisdiction directly on point, and we are not willing to rule, either as a general proposition or in the specific context of this case, that a criminal defendant, through his own testimony, can authenticate his own excited utterance.[20] Moreover, because evidentiary rulings such as these are discretionary, we have no basis to conclude that the trial court abused its discretion in requiring more corroborative evidence under the circumstances, particularly when Coleman's testimony was inadequate and no other testimony was forthcoming. We hold, therefore, that the trial court's ruling that appellant could not testify about his own excited utterance does not warrant reversal.

■ But that does not end the matter. Appellant also argues that, by refusing to allow Mr. Brown to testify about the excited utterance,[21] "the trial judge erroneously created a categorical rule that statements conveyed to the court by witnesses friendly to the defense are inadmissible as excited utterances." This is not an accurate description of what the trial judge did. Rather, the judge appears to have based his ruling mainly on the absence of evidence about the length of time between the events in the alley and appellant's statement to Mr. Brown. In so ruling, however, the judge committed reversible error.

"This court has consistently held . . . that a lapse of time, while a relevant factor, is not dispositive on the question of admissibility [of an excited utterance]." *Bryant v. United States,* 859 A.2d 1093, 1107 (D.C.2004) (citations omitted); *see Price v. United States,* 545 A.2d 1219, 1226 (D.C.1988) ("a lapse of time is relevant, but not controlling"); *Bandoni v. United States,* 171 A.2d 748, 750 (D.C. 1961) ("time alone is not controlling in determining the spontaneity of an exclamation"). Thus the trial court erred by insisting that appellant show exactly how much time elapsed between the events in the alley and his statement to Mr. Brown. Appellant had already established the proximity of the alley to Brown's apartment and had stated that he ran there from the alley, stopping only briefly at Ms. Jones' apartment. Brown testified that appellant, when he arrived, "looked hys-

---

20. We are not saying that, as a general principle, it is legally impossible for a defendant to authenticate his own excited utterance. We merely conclude, given the facts of this case, that the court did not abuse its discretion in denying appellant that opportunity.

21. At oral argument the government suggested that, because no proffer was made as to the content of Mr. Brown's testimony regarding appellant's excited utterance, it was not even clear what Brown would have said. We think the government reads the record too narrowly. The trial transcript clearly indicates that the court understood, when defense counsel said he wanted to introduce "the excited utterance," that the substance of that utterance was that two men had tried to rob appellant. Indeed, a lengthy discussion ensued regarding the circumstances surrounding the excited utterance. We have no doubt that all parties, including the court, were aware of exactly what testimony the defense was seeking to present.

terical," "looked scared, real scared," "was terrified," and "was shaking." These details plainly supported appellant's claim that at the time he spoke with Mr. Brown, he was still reacting to the excitement of the incident.

In addition, there is no case law in this jurisdiction to support the notion that a witness must be "disinterested" or "neutral" in order to testify to someone else's spontaneous utterance. As we have pointed out, the trial court concluded that Mr. Brown was not a reliable witness because he was appellant's longtime friend. This, however, was essentially a credibility determination which should have been left to the jury. Whether Brown should be disbelieved because he was appellant's friend, and thus not an "independent" witness, would affect only the weight of Brown's testimony; it would not, by itself, render Brown's testimony inadmissible. *See Newman v. United States,* 705 A.2d 246, 259 (D.C.1997) ("[i]n evaluating the reliability of the proffer ... the court must not seek to evaluate the reliability of the *witness*" (emphasis in original)). By declaring Mr. Brown inherently unreliable as a witness, the court made it impossible for appellant to present evidence related to his actions in response to the alleged attack. As a result of the court's ruling, appellant was barred from presenting testimony that was crucial to his defense.

 Because we conclude that the trial court abused its discretion in preventing Mr. Brown from testifying to appellant's statements that someone tried to rob him, we must determine whether that error was harmless under the standard set forth in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *see, e.g., Smith,* 666 A.2d at 1225. Under that standard, this court must be satisfied "with fair assurance, after pondering all that happened without stripping the erroneous

action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239.

Appellant's defense was that he shot Butler in self-defense. To this end, he sought to show that Butler and another man tried to rob him in the alley at gunpoint, and that shortly after the incident he told this to both Mr. Coleman and Mr. Brown. Although we do not find error on this record with respect to what appellant said to Mr. Coleman, the trial court's evidentiary ruling as to the testimony of Mr. Brown prevented appellant from presenting any evidence about his conversations with either man. Consequently, the jury was left to wonder why he never mentioned the attack to his two friends, especially considering that he saw both of them only moments after the alleged attempted robbery. In these circumstances we cannot conclude "that the judgment was not substantially swayed" by the trial court's error, *id.* at 765, 66 S.Ct. 1239, and accordingly we hold that the error was not harmless.

### B. *Appellant's Failure to Contact the Police*

 Appellant also argues that "the trial court violated [his] right to present material portions of his testimony when it ruled that he could not explain his failure to report the crime and inconsistent statements to the police without 'opening the door' to evidence of prior police contacts." This ruling, he maintains, "violated [his] constitutional rights under the Compulsory Process Clause of the Sixth Amendment, the Due Process Clause, and the 'necessary corollary to the Fifth Amendment's guarantee against compelled testimony.'" We cannot consider the merits of this claim, however, because appellant failed to preserve it for appellate review.

Relying primarily on the Supreme Court decision in the *Luce* case [22] and this court's adoption of the *Luce* rationale in *Butler v. United States,* 688 A.2d 381 (D.C.1996), the government contends that "[t]he trial court never made a final ruling on the admissibility of prior police contacts with appellant, and appellant failed to preserve that claim for appeal." We agree.

*Butler* provides a close analogy to the instant case. In *Butler* the trial court made a preliminary ruling before trial that, if the defense wanted to proceed on the theories of bias and fabrication (*i.e.,* that the officers who arrested the defendant were somehow biased against him), the government would be allowed to rebut those theories with evidence of the defendant's prior arrests and contacts with the police. As a result of that ruling, the defense chose not to present those theories at trial, but then claimed on appeal that the trial court erred "in ruling that cross-examination of the arresting officers on bias 'opened the door' to evidence of appellant's prior arrests by the same officers." *Butler,* 688 A.2d at 386. We rejected this argument and held, on the basis of *Luce,* that we had "no factual or record context to resolve Butler's contention on appeal. As the Court said in *Luce,* 'it would be a matter of conjecture whether the [trial court] would have allowed the government to attack [appellant's] credibility at trial by means of the prior conviction.'" *Id.* at 388

(quoting *Luce,* 469 U.S. at 41, 105 S.Ct. 460).

The present case is quite similar. Here, as in *Butler,* the trial court did not make a final ruling. While it did say that the government would be allowed to introduce some evidence of appellant's prior contacts with the police, the court never established or announced how far the government would be permitted to go. Moreover, upon learning that the government would be able to bring in some evidence of these prior contacts, defense counsel withdrew the question and never again raised the issue. Thus the court had no occasion to make any precise determination about what evidence would be excluded and what evidence would be admitted. Finally, "if we were to conclude that the ruling was erroneous, the limited record before us would preclude us from determining whether the error was prejudicial or harmless." *Bailey,* 699 A.2d at 402. We cannot decide whether the court erroneously admitted any testimony about appellant's prior contacts with the police on the theory that the defense opened the door to such testimony, because the government did not seek to admit such testimony. Had appellant chosen to continue testifying about the earlier incident, and had the government then presented related evidence, this would be a different case. But without such evidence, we cannot assess any argu-

---

**22.** In *Luce* the defendant filed a motion *in limine* to preclude the prosecutor from impeaching him with a prior conviction. The trial court denied the motion. At the trial that followed, the defendant did not take the stand, and the jury found him guilty. The Supreme Court affirmed the conviction and "gave three essential reasons for its decision." *Bailey v. United States,* 699 A.2d 392, 399 (D.C.1997). First, "any possible harm from the trial judge's denial of the ... motion was 'wholly speculative,' for the ruling was 'subject to change when the case unfolds, particu-

larly if the actual testimony differs from what was contained in the defendant's proffer.'" *Id.* (quoting *Luce,* 469 U.S. at 41, 105 S.Ct. 460). Second, "'[b]ecause an accused's decision whether to testify seldom turns on the resolution of one factor ... a reviewing court cannot assume that the adverse ruling motivated a defendant's decision not to testify.'" *Bailey,* 699 A.2d at 399 (quoting *Luce,* 469 U.S. at 42, 105 S.Ct. 460). Third, "the defendant's position tended to circumvent the 'harmless error' doctrine." *Bailey,* 699 A.2d at 399.

able error on the part of the court in suggesting that appellant's proposed testimony would open the door to anything.

### III

For the reasons set forth in part II–A of this opinion, the judgment of conviction is reversed, and the case is remanded for a new trial.

*Reversed and remanded.*